Thomas N. COCHRAN, Plaintiff,

v.

A/H BATTERY ASSOCIATES and Arcorp Properties, Inc., Defendants.

No. 92 Civ. 5116.

United States District Court, S.D. New York.

Dec. 26, 1995.

Stanley A. Teitler P.C. (Stanley A. Teitler, of counsel), New York City, for Plaintiff.

Donovan Parry Walsh & Repetto (David R. Hornig, Robert A. Novak, of counsel), New York City, for Defendant.

## OPINION, FINDINGS OF FACT AND CONCLUSIONS OF LAW

BERNARD NEWMAN, Senior Judge [1]:

Thomas N. Cochran, a resident of New Jersey, brings this action grounded in admiralty against A/H Battery and ARCORP Properties (hereinafter "defendants"), respectively a partnership and related corporation engaged in the transportation of passengers from New Jersey to New York by ferry boat. Plaintiff seeks an unspecified amount of compensatory damages for his claim that while he was a passenger on the Alexander Hamilton (hereinafter "Hamilton"), one of defendants' ferries, he was injured as the result of an allision. In addition to compensatory damages, plaintiff asks for punitive damages alleging gross misconduct on the part of the defendants. While defendants concede liability in this matter, they contend that plaintiff's injuries are so slight that only *de minimis* damages should be awarded. Defendants further maintain that under the current state of admiralty law, punitive damages may not be awarded in this case. Finally, defendants argue that their conduct does not rise to the level of egregiousness necessary for an award of punitive damages.

## THE RECORD

Plaintiff presented three witnesses: plaintiff, a features editor for Barrons magazine; R. David Stewart, an expert in the field of marine engineering; and Dr. Robert Hyman, an expert in the area of orthopedic surgery. Defendants presented four witnesses: Robert Gavares, the captain of the Alexander Hamilton ferry on February 12, 1992, Douglas S. Neeb, an expert in the field of marine engineering, James Silecchia, the mechanic for the ferry system, and Mark Summers, the usual captain of the Alexander Hamilton ferry. Upon joint motion by all parties the affidavit of James Meagher, Cochran's supervisor at Barrons, was admitted into evidence (R. 196). The parties introduced 12 documentary exhibits into evidence.

## CONTENTIONS OF THE PARTIES

Plaintiff maintains that on February 12, 1992 at approximately 7:45 a.m., he was a paid passenger aboard the Hamilton ferry en route to the World Financial Center (hereinafter "WFC") from Hoboken, New Jersey. As the Hamilton was approaching the mooring at the WFC, it allided with the dock, propelling plaintiff forward into a metal pole. Plaintiff contends that as a result of the allision, he had severe pain in his left knee and head. Due to his head injury, plaintiff alleges that he experienced cognitive difficulties causing him to make errors while typing and producing his column. Although plaintiff was able to correct most of these errors, he argues that some mistakes were published, that he suffered anxiety from the belief that he would lose his job, and claims that he has developed a permanent sexual disfunction. Plaintiff also testified that as a result of the knee injury, he was forced to refrain from engaging in many of the sports he had previously enjoyed. Moreover, plaintiff asserts that the lasting effects of the injury to his knee has caused him continuing difficulty when participating in sporting events and

---

1. Bernard Newman, Senior Judge of the United States Court of International Trade, sitting as United States District Judge by designation.

created a likelihood that he may require future knee replacement surgery. In addition to seeking compensatory damages for his sustained injuries, plaintiff further requests punitive damages based on his allegation that although defendants knew or should have known about the unsafe condition of the ferry, they nonetheless allowed it to transport passengers thereby demonstrating gross negligence.

Defendants concede ordinary negligence with regard to the allision. Nor do they deny that plaintiff was injured when the ferry struck the dock. Defendants, however, argue that plaintiff is only entitled to a *de minimis* damage award because his injuries were temporary and slight. Specifically, defendants challenge that plaintiff's cognitive abilities were seriously impaired. In support, they point to plaintiff's own admission that nobody at Barrons ever commented on his supposedly deteriorating work. Further, defendants claim that any anxiety plaintiff experienced regarding the possibility of losing his job was self-induced, in that, his superior did not consider plaintiff's work of any lesser quality than prior to the accident. As to plaintiff's sexual impairment claim, defendants respond that because plaintiff was never medically treated for such a problem and his wife never articulated to him that she noticed any problem or difference with regard to his sexual performance, there is insufficient evidence to support an award of damages.

Defendants agree that plaintiff's knee was injured in the allision but dispute that the current medical status of his knee was the result of the allision. Because his treating physician never diagnosed significant cartilage damage to plaintiff's knee until such time as plaintiff's knee failed during a skiing holiday at an extremely difficult ski resort, defendants maintain that the current condition of plaintiff's knee cannot be wholly attributed to the allision and, rather it is more likely that plaintiff's skiing caused unrelated, additional, and more serious knee damage.

Finally, in addition to arguing that punitive damage are not recoverable as a matter of law in this type of action, defendants contend that there was no showing of gross negligence or willful misconduct to warrant an award of punitive damages.

## FINDINGS OF FACT

Plaintiff, a resident of New Jersey, is employed as a features editor by Barrons Magazine. On February 12, 1995, as was his custom since October 1989, plaintiff was a lawful paid passenger in New Jersey aboard the Hamilton ferry, a vessel for hire, owned and operated by defendants. Earlier that morning James Silecchia, the mechanic for the four vessel fleet, began the start up procedure for all four of the ferries, including the Hamilton. This procedure included the checking of the air system and the draining of the air tanks as well as the air filter system. After starting the ferry, Silecchia found the Hamilton to be in fully operating condition. The ferry departed Hoboken at 7:40 a.m. en route to the WFC, located in New York City, in what would be its third one way transit across the Hudson River on that morning. At approximately 7:48 a.m., as the ferry was approaching its New York destination, the vessel's captain Robert Gavares attempted to bring the ferry to a complete stop. At that moment, the low air pressure alarm in the pilot house sounded and Captain Gavares did not have any control over the vessel's air pneumatic system, which is used to control the ferry[2]. Because Captain Gavares was unable to make the vessel come to a halt, it continued moving forward at an approximate speed of five knots until it allied with the dock at the side of the WFC.

Plaintiff, who was seated at the time of the allision, was propelled forward into a metal railing hitting his head and left knee. Although he was injured, plaintiff was able to walk under his own power to a physician located at the World Trade Center and sub-

---

**2.** The pneumatic system pushes compressed air through a series of copper lines which link to the ferry's starboard and port propulsion system. One line runs from the engine room to the throttle mechanism and controls the engine speed and two other lines are attached to the transmission ahead and astern position controls. Those lines govern the direction of rotation of each propeller. In total their are six lines, three for starboard and three for port side of the ferry.

sequently went to work. That weekend, he sought additional medical attention. Plaintiff maintains that as a result of his head injury he was not able to perform his job effectively. Specifically, plaintiff stated that after the allision, he made several typographical, repetitive, and definitional errors in the articles he authored for Barrons, some of which were published. Although he never mentioned these problems to anyone at Barrons, plaintiff explained that he feared discovery of the errors by his employer would put his job in jeopardy. The anxiety plaintiff experienced regarding his job performance, manifested itself into a fear of losing his livelihood. Despite these fears, however, plaintiff admits that he was able to quickly discover and correct nearly all of his typographical errors, and that nobody in the company seemed to notice his difficulties. Plaintiff's supervisor, James Meagher, in his affidavit stated that there was no change in "the quality of writing with report to the articles drafted and edited by Thomas Cochran since February 12, 1992," and that the quality of the materials prepared by Mr. Cochran after the allision "were consistent with and as good as the quality of reports prepared prior to the accident." Affidavit of James Meagher, pp. 1–2, par. 3[3]. Plaintiff admits that this condition was temporary and that his cognitive functions fully returned sometime around May or June of 1992. It is undisputed that plaintiff suffered no lost wages or earnings as a result of any of his injuries.

With respect to his head injury, plaintiff also complained that less than one week after the allision his sexual relations with his wife were affected. Plaintiff testified that:

> [s]ex isn't as much fun as it was. It doesn't take place as often as it did. I don't know, it was overnight, and I don't know why the heck it would happen from a blow to the head, but things just didn't work as well, and it's a darn sight less fun.

(R. 33). While plaintiff testified that he told his doctor of this problem, he decided not to undergo any medical treatment. In addition, no medical evidence regarding any sexual dysfunction was presented and plaintiff conceded that his wife neither complained, nor even broached the subject of plaintiff's sexual performance (R. 58).

The majority of plaintiff's claim regarding the damages he suffered are related to the knee injury sustained in the accident. This injury is the subject of sharp disagreement between the parties. Plaintiff alleges that the injury to his knee is serious, that it impedes his enjoyment of recreational sports, and may result in subsequent knee replacement surgery[4] (R. 209–211). Although he was unsure of the exact amount, plaintiff testified that his out of pocket medical expenses totaled between $4500 and $8500 (R. 36). Defendants respond that the only injury to plaintiff's knee that is attributable to the allision is "a bone bruise," and that any subsequent serious damage was as a result of a skiing trip taken by plaintiff in December 1992. In resolving this factual dispute, the court finds that neither parties' account of the severity of plaintiff's knee injury is supported by the evidence presented.

Defendant's contention that the injury is nothing more than a "bone bruise" is flatly contradicted by the expert testimony submitted by plaintiff as well as the medical records entered into evidence[5]. There is no dispute that Dr. D'Agostini, plaintiff's treating physician for his knee ailment, stated "my initial assessment at the time to the initial evaluation was that [plaintiff] had sustained a chondral contusion, also known popularly as a bone bruise" (Defendant's Exh. J). Defendant, however, blanketly ignores the fact that after an MRI was taken on March 9, 1992, Dr. D'Agostini confirmed that there was a bone bruise and stated that there also appeared to be "a trabecular micro fracture,"

---

3. In the interest of judicial economy, counsel stipulated to the admission into evidence of the James Meagher affidavit in lieu of calling him to the stand (R. 195).

4. Plaintiff did not call as a witness, Dr. Robert J. D'Agostini Jr., the orthopedist who was regularly treating plaintiff's knee. With the consent of

both parties, Dr. Agostini's medical records were admitted into evidence (R. 230).

5. Defendants did not present any independent medical evidence and relied solely on the medical records of Dr. D'Agostini and plaintiff's expert witness Dr. Robert Hyman.

as well as, "a type 1 change in the medial meniscus". (*Id.*; R. 208). Indeed, in his report, Dr. D'Agostini explained that "this means that the supporting bone underneath the chondral cartilage has been fractured and though there is no gross disruption on the bone, which would have been obvious to the x-ray, it is indicative of the severity of the trauma that the knee has been subjected to." *Id.* Dr. Agostini further pointed out that as a result of the knee injury sustained in the ferry accident, plaintiff has an unquantifiable risk "of the development of osteoarthritis." Defendant's Exh. J. Lastly, while defendants correctly point out that plaintiff was able to engage in sporting activities, plaintiff's testimony, corroborated by the medical records, is that he was not able to pursue sports as vigorously as he could prior to the allision (R. 27–28; Defendant's Exh. J). Clearly then, the extent of plaintiff's knee injury is more serious than a mere bone bruise as suggested by defendant.

Conversely, the court believes that the current status of plaintiff's knee injury cannot be solely attributed to the allision. The evidence demonstrates that plaintiff's knee suffered additional injury as a result of his actions and failure to take proper precautions. One glaring incident that must be addressed is the failure of plaintiff's knee after four and one half days of rigorous skiing at Taos, New Mexico. At the end of December 1992, plaintiff vacationed at what he characterized as one of the best and most challenging ski resorts in the world at Taos (R. 66). While there, plaintiff for four and one half days skied the most difficult of the trails (R. 66). Plaintiff explained his preference for challenge, stating that "I like it if it is difficult. If you don't have to stop and pray before you go down it isn't worth doing." (R. 66). After skiing the "double black diamond" trails for four and one half days, plaintiff testified that his knee failed. Upon returning home, plaintiff had his knee examined by Dr. D'Agostini who diagnosed the problem as an injured or possibly torn lateral meniscus. Defendant's Exh. J. Significantly, in the medical records he prepared, Dr. Agostini concluded that this injury to plaintiff's knee was "unrelated to his previous accident". Defendant's Exh. J, p. 3. At the time of the examination on January 7, 1993, Dr. Agostini explained to plaintiff that his injury was a result of "accumulated wear and it is not uncommon in a 55 year old recreational athlete." *Id.* It is also important to note that Dr. Hyman, plaintiff's own expert in orthopedic surgery, testified that he reviewed and agreed with Dr. Agostini's opinions as stated in the medical records (R. 222).

Considering the personality and demeanor of plaintiff, it is not unreasonable to determine that plaintiff caused additional damage to his knee by virtue of his own actions. Dr. D'Agostini's notes makes clear that plaintiff was reluctant to follow the doctor's advice with regard to allowing the knee to heal. Dr. D'Agostini noted that on July 7, 1992, he told plaintiff that he could slowly resume normal activities, to which plaintiff replied "that he cannot do things gradually, he will go back to playing 100%." Defendant's Exh. J, p. 4. Dr. Agostini then noted that he "spent quite a bit of time trying to explain to [plaintiff] the physiology of fracture healing and why it is crucial that he not overload the bone immediately". *Id.* Having had the opportunity to observe plaintiff, the court concludes that he is man who enjoys challenge and competition. Indeed plaintiff, when discussing such mundane routine activities as typing, explains that in order to keep up the challenge he types "as hard and as fast" as he can. Examined as a whole, the evidence demonstrates that plaintiff caused additional injury to his knee as a result of the difficult skiing in which he chose to engage.

Finally, with regard to the question of the extent of damage to plaintiff's knee, the court does not doubt the ultimate medical opinion of Dr. Hyman, but does not accept some of the underlying assumptions he made in reaching this conclusions. Ultimately, Dr. Hyman opined that there is a reasonable degree of certainty that plaintiff will:

> sustain a secondary degenerative osteoarthritis of the knee, that is, an osteoarthritis which is the result of a superimposed condition as a result of primary arthritis, which is, happens in many people. It affects the knees, the hips, the bases of the thumbs and the big toe. That is primary and degenerative osteoarthritis, and I

called [plaintiff's] condition a secondary degenerative osteoarthritis because the osteoarthritis would have been provoked by this accident and injuries. It would be the sequelae of the accident and injuries (R. 209).

Accordingly, Dr. Hyman concluded that this condition could ultimately lead to a severe enough condition "that he would be a candidate for a total knee arthroplasty, or total knee replacement" (R. 210). The cost of a total knee replacement, if it were to be necessary would be approximately $25,000 to $30,000 dollars, quite apart from the possibility of pain and suffering (R. 213). Indeed, Dr. Hyman's ultimate opinion regarding the condition of plaintiff's knee is virtually uncontested, as defendants failed to offer their own expert in orthopedics.

The court, however, is troubled over Dr. Hyman's assumption that the condition of the knee was solely due to the allision. Dr. Hyman examined plaintiff on only one occasion, more than two years after the allision. In addition, Dr. Hyman was not informed by plaintiff about the knee problem experienced during the skiing vacation in December 1992 (R. 219). Although Dr. Hyman stated that he agreed with Dr. D'Agostini's conclusion that the subsequent injury discovered while skiing was unrelated to the ferry accident, he nonetheless only considered the allision as the source of plaintiff's knee damage. The evidence simply does not support that elementary analysis.

While Dr. Hyman testified that he found a condition of atrophy within plaintiff's knee, he could not with any degree of medical certainty relate the atrophy to any specific injury or demonstrate when it first occurred (R. 223–224, 227). Curiously, although Dr. Hyman stated that it was his understanding that common medical practice would be for a doctor to record any findings of atrophy, plaintiff's treating physician never reported such a condition (R. 218; Defendant's Exh. J). Furthermore, Dr. D'Agostini's records indicate that plaintiff's knee was progressing and did not demonstrate additional problems until after plaintiff was hurt while skiing (Defendant's Exh. J.). Lastly, Dr. D'Agostini, in his reports, never made any mention of

a prognosis which included future knee replacement. In point of fact, Dr. Hyman's expert report made no mention of that possibility. It was only when Dr. Hyman was on the stand that this possibility was first documented.

The short of the matter is that the court accepts Dr. Hyman's findings as to the present condition of plaintiff's knee. However, the evidence does not support plaintiff's claim that the sole cause of the present damage to the knee was the allision. After weighing all of the evidence in this case, the court finds that while plaintiff suffered a significant injury to his knee as a result of the accident, plaintiff's condition was worsened by factors that are completely unrelated to the injuries sustained as a result of the Hamilton's crashing into the dock. It is undisputed that plaintiff is not presently seeing a doctor for his left knee and had not seen a doctor since at least September 2, 1993 (R. 90).

According to defendants witnesses Silecchia, Captain Garvares, and Captain Summers, this incident represented the first time that any of the ferries experienced a total loss of air pressure while transporting passengers (R. 263–64, 268, 270, 443, 481). On two occasions prior to the allision, it was discovered during the start-up procedure that the Hamilton had no air pressure resulting from an ice blockage in the line. Each of these incidents occurred on Monday mornings after the ferry had remained stagnant in the water during an extremely cold weekend. On those two occasions, the blocked air lines were cleared by applying heat to the pneumatic lines, and after the application of heat, the vessel operated without incident (R. 440–41, 484–86). The Hamilton is a Coast Guard documented vessel and is regularly inspected by both the Coast Guard and the American Bureau of Shipping (hereinafter "ABS") (Exhs. C, I; R. 135–137, 463). Interestingly, the Coast Guard and ABS both approved the use of the Hamilton as a year round passenger vessel on the Hudson River (R. 140–43).

## DISCUSSION

Admiralty jurisdiction in tort exists where the alleged wrong occurred on naviga-

ble waters within the United States, and where the wrong bears "a significant relationship to traditional maritime activity". *Executive Jet Aviation, Inc. v. City of Cleveland,* 409 U.S. 249, 268, 93 S.Ct. 493, 504, 34 L.Ed.2d 454 (1972); *see also, Foremost Ins. Co. v. Richardson,* 457 U.S. 668, 674, 102 S.Ct. 2654, 2658, 73 L.Ed.2d 300 (1982). Since the ferry was sailing in the Hudson River and the allision occurred when it was about to moor, the activity is properly classified as a traditional maritime activity which occurred on the navigable waters of the United States, and accordingly, federal maritime law governs this case. *Sundance Cruises Corp. v. American Bureau of Shipping,* 7 F.3d 1077, 1081 (2d Cir.1993) (action properly brought under federal admiralty law when the cause of action constitutes a maritime tort). Because defendants conceded liability at trial (R. 3), the court must determine what are plaintiff's proper compensatory damages and whether plaintiff is entitled to punitive damages in this case. For the following reasons the court awards plaintiff $35,000 in compensatory damages, and denies his claim for punitive damages.

### A.

■ There is no question that plaintiff is entitled to an award of damage as a result of the injuries he suffered in the accident. Calculation of any monetary compensation for a physical injury will always be an inexact science. Indeed, the issuance of a monetary award to compensate a person for sustaining physical injury is a legal fiction proclaiming that money damages can somehow cure physical damage or ease pain caused by another party's negligence. Inasmuch as no money award can ever reach back into the past and prevent a defendant's negligence, it is nonetheless the only compensation for an injury provided by our judicial system. As in any case where the injury sought to be compensated may have future ramifications to the victim, fixing an exact measure of damage is never capable of precise quantification but nevertheless must still be contained within objective limits.

■ When the elements of damages for personal injuries cannot be precisely calculat-

ed, the exact amount of a damage award is left to the sound discretion, exercised reasonably and within the proof of the case, of the trier of fact. *F.H. Krear & Co. v. Nineteen Named Trustees,* 810 F.2d 1250, 1260 (2d Cir.1987) (while trier of fact has substantial discretion in awarding damages, there must be a rational basis for the calculation); *Martell v. Boardwalk Enters.,* 748 F.2d 740, 750 (2d Cir.1984); *see also Neyer v. United States,* 845 F.2d 641, 644 (6th Cir.1988). "In ascertaining damages, the fact-finder should ascertain the past and future impact of the injury by examining (1) the nature, extent, and duration of the injury; (2) the plaintiff's pain, discomfort, suffering, and anxiety; (3) the reasonable expenses of necessary medical care; and (4) any lost earnings." *Willie Williams v. United States,* 712 F.Supp. 1132, 1136 (S.D.N.Y.1989). It is also appropriate to determine and factor into an award of damages any evidence that a portion of plaintiff's claimed injuries have resulted from incidents subsequent and unrelated to the defendant's negligent act. *Gander v. Mr. Steak of Sun Ray, Inc.,* 774 F.2d 920, 924–25 (8th Cir.1985).

Plaintiff concedes that he suffered no lost earnings as a result of the allision. Consequently, the court must now determine the approximate "worth" the injury actually sustained by plaintiff as a result of the allision. "Although it is inherently difficult to compare the award for personal injuries in one case with another because there are many variables and all the pertinent facts are rarely the same, awards for similar injuries in prior cases are of some comparative value, and at least give some guidance regarding the range of lower and upper figures." *David Williams v. United States,* 747 F.Supp. 967, 1011 (S.D.N.Y.1990). In fact, courts have long reviewed damage awards in other similar cases to determine the scope of reasonableness in a particular case. *See e.g., Scala v. Moore McCormack Lines, Inc.,* 985 F.2d 680, 684 (2d Cir.1993); *Nairn v. Nat'l R.R. Passenger Corp.,* 837 F.2d 565, 568 (2d Cir. 1988). In resolving this case, while the court has surveyed a number of cases involving similar injuries, its ultimate determination

rests with the facts as demonstrated by the evidence of this particular trial.

It is unquestioned that plaintiff suffered a trabecular micro fracture in his knee. Immediately following the allision, while plaintiff was still able to walk, the uncontroverted testimony was that he could only do so with great pain and difficulty. Plaintiff, an individual who enjoys participating in sports, was not able to resume recreational activities for some time. The medical records of Dr. Agostini demonstrate that he was in great pain and did not have full mobility for several months. In addition to the pain attributed to the knee injury, the court credits plaintiff's testimony that for a short period of time after hitting his head, he was not able to effectively type his column. While plaintiff did not lose any wages, certainly such a significant and troubling, albeit temporary, impairment in his ability to effectively perform the tasks necessary for his livelihood warrants some degree of compensation [6].

Fortunately, however, it seems that the worst of plaintiff's problems were temporary. Plaintiff testified that he no longer had any of the confusion that caused him to experience typing problems and related anxiety. Additionally, it appeared that plaintiff's knee had healed sufficiently for him to return to his normal routine. Less than one year after the accident, plaintiff apparently felt well enough to take a skiing holiday and ski some of the most challenging and difficult trails in the country. It was during this vacation that plaintiff's knee was reinjured in what was termed an "unrelated" incident by his treating physician. This injury consisted of either torn or otherwise damaged meniscus in plaintiff left knee. Plaintiff's expert witness, Dr. Hyman, testified that upon examining plaintiff he found some atrophy and diagnosed the possibility of future problems plaintiff may face. More, Dr. Hyman speculated that plaintiff may face future arthroscopic or even knee replacement surgery. Of course as with any prediction, there is the possibility that plaintiff will not need such surgery. It is under these facts that the court needs to determine the proper scope of damage.

Awards for knee injuries have varied greatly, depending on the severity and longevity of the injury. It appears that the monetary range for similar injuries sustained to the knee can range anywhere from approximately $15,000 to over $400,000. Surveying various jurisdictions the court has noticed some developed patterns regarding compensation awards. At the lower end of the scale are injuries that were not too severe, did not require extensive medical attention, and while some of the injuries did have lasting effects on the victims, the resulting disability was not great. *See e.g., Boothe v. State Farm,* 616 So.2d 871 (La.App.1993) (award of $14,000 for injury of knee contusions and probable tendinitis, considered slight injury but caused pain and limited victim's participation in sports); *Ostry v. Chateau Ltd. Partnership.,* 241 Ill.App.3d 436, 181 Ill.Dec. 877, 608 N.E.2d 1351 (1993) (compensation of $30,633.94 awarded to woman whose knee injury required two operations and had lasting effect of pain, inability to lift heavy objects, difficulty in walking up stairs, probability of future arthritis, and permanent inability to straighten knee); *Fish v. Carstens,* 437 N.W.2d 589 (Iowa App.1989) (plaintiff who experienced swelling and discomfort in knee, incurred a five percent impairment of lower extremities, arthroscopic surgery, rehabilitation therapy, and six week absence from work awarded $28,309.80); *Akin v. Estate of Patti,* 149 A.D.2d 964, 540 N.Y.S.2d 397 (4th Dept.1989) ($25,500 judgment for woman who injured knee in auto accident, developed chondromalacia in the knee, and had permanent restriction from performing task which required the knee to bend); *Book v. Nordrill,* 826 F.2d 1457 (5th Cir.1987) (plaintiff who sustained undisclosed injury to knee and was able to return to work as roustabout awarded $25,000); *Maritime Overseas Corp. v. Narvaez,* 728 S.W.2d 924

---

**6.** Although plaintiff claims some sort of lasting sexual disfunction as a result of the allision, this allegation is not supported by the evidence. Plaintiff never clearly identified the nature of the problem, it was not supported by any medical evidence, and there was no plain link establish-

ing how this alleged problem could be related to the ferry accident. Plaintiff admitted that his wife had never uttered one word about this problem. Therefore, the evidence is insufficient to support any damage award on this speculative uncorroborated allegation.

(Tex.App.1987) (Injured seaman who suffered nondisplaced fracture of patella of right knee, pain, mental anguish, and will have future pain in foggy damp weather, awarded $35,000); *Helena Chemical Company v. Ahern,* 496 So.2d 12 (Ala.1986) ($29,000 judgment for woman with unspecified knee injury which did not require significant medical treatment and aggravation of prior back injury); *David v. Pueblo Supermarket of St. Thomas,* 740 F.2d 230 (3d Cir.1984) (damage award reduced from $80,000 to $30,000 for plaintiff who fell in supermarket and injured her back and knee and continued to have pain in her knee as a result of the accident); *Bishop v. Shelter Ins. Co.,* 465 So.2d 737 (La.App.1984) (plaintiff awarded $29,000 after sustaining injuries to his head and knee, including a tear of the medial meniscus, which although it healed allowing plaintiff to return to work, still caused occasional pain).

On the other hand, those cases where the victims were awarded higher sums of money generally contained more serious injuries to the knee, immediate surgery, large degrees of pain and suffering, loss of employment, continuing discomfort, and strong likelihood that future surgery would be required. *See e.g., DiFiore v. Casco N. Bank, N.A.,* 621 A.2d 860 (Me.1993) ($40,000 awarded to plaintiff who because of torn meniscus of degenerative lesion on femur suffered immediate and ongoing pain, great diminishment of lifestyle, and constant fear of future wheelchair confinement); *Castellano v. City of New York,* 183 A.D.2d 800, 584 N.Y.S.2d 114 (2d Dept.1992) (police officer who suffered knee injury diagnosed as chondromalacia patellae, had two arthroscopic surgical procedures, would require future surgery, possible kneecap removal, will suffer severe arthritis, and considered partially disabled, thereby unable to continue employment, awarded $432,000 in total damages which was reduced from original trial award of $832,000); *Stetz v. Skaggs Drug Centers, Inc.,* 114 N.M. 465, 840 P.2d 612 (App.1992) ($40,000 awarded to woman who fell and aggravated a pre-existing knee condition causing severe pain and loss of mobility in addition to injuries to her hip, pelvis, ribs, and shoulders); *Wallace v. State Farm Mut. Auto Ins. Co.,* 509 So.2d 466 (La.App.1987) ($50,000 awarded to man who sustained contusions to both knees, where one of the knees developed signs of chondromalacia and possible cartilage tear, causing a twenty percent impairment of the knee); *Cooper v. Levittown Roller Rink,* 117 A.D.2d 773, 499 N.Y.S.2d 104 (2d Dept.1986) ($90,000 awarded to victim who suffered unspecified permanent injuries to wrist and knee, severe pain, and considerable restriction of once active lifestyle); *Lewis Grocer Co. v. Williamson,* 436 So.2d 1378 (Miss. 1983) (plaintiff who suffered badly sprained knee requiring surgery, placed in a long cast, needed crutches for several months and thereafter a brace, sustained permanent residual disability in knee, and unable to continue employment, awarded $75,000); *Starlings v. Ski Roundtop Corp.,* 493 F.Supp. 507 (M.D.Pa.1980) ($100,000 reduced to $50,000 awarded to man injured in skiing accident who required two operations required to repair torn ligaments and was left with a twenty-five percent disability to his knee and was unable to continue current employment); *Moore v. Grantham,* 599 S.W.2d 287 (Tex. 1980) ($56,576.44 judgment for unspecified serious injury to knee and neck, twenty percent permanent disability, inability to sit for prolonged periods of time, possible future surgery).

Against this backdrop, the court must look at the specific evidence presented in this case regarding plaintiff's injury. The mainstay of plaintiff's claim is that he suffered serious and permanent injury to his knee, which he argues is likely to get progressively worse and culminate in the necessity of knee replacement surgery. Plaintiff does not quantify his damages in any specific money amount. The only indicia of cost was Dr. Hyman's testimony that knee replacement surgery could cost in the area of $30,000 (R. 210). Plaintiff additionally maintains that as a result of the blow to the head he received, he had difficulty typing his column at Barrons for a period of several months, suffered anxiety that he would lose his job, and alleges some sort of sexual difficulty which he contends is a result of the ferry accident.

Defendants respond that plaintiff's head injury was insignificant, that plaintiff admitted to making typing errors before the acci-

dent, that any difficulty he had with typing and his job is no longer present, that the alleged sexual disfunction was not supported by medical evidence, there was no treatment for it, and that by plaintiff's own admission, his wife never indicated that there was a problem. With regard to the knee injury, defendants argue that the injury which has led to speculation about knee replacement was a result of plaintiff's skiing trip and unrelated to the ferry accident. Defendant's maintain that while plaintiff is entitled to some award of damages, the award is "limited to pain and suffering" and similar injury awards are approximately "$25,000." Defendant's Post–Trial Findings of Fact. P. 22.

There is no doubt that plaintiff suffered a significant knee injury. He was in a great deal of pain, was in need of medical treatment, had to refrain from his active lifestyle, and was required to engage in rehabilitative exercise for several months. At the same time, while the injury cannot simply be dismissed as nothing more than a "bone bruise," the damage sustained as a result of the allision is not the type that will significantly and permanently impede to plaintiff's life. Plaintiff did not require an operation, a cast, crutches, or even a cane (R. 81–82). It is unquestioned that plaintiff had to cease his significant physical activity; however, it is also true that he was able to resume athletic activities. Less than one year after the accident plaintiff continued to hunt and was never told not to engage in trap or skeet shooting. Also, plaintiff testified that he has resumed playing golf and tennis virtually as often as he did before the allision. Significantly, plaintiff's knee was so healed by December 1992 that he was able to venture skiing on what he admitted was one of the hardest most extremely challenging ski resorts in the world, located at Taos, New Mexico. For four and one half days plaintiff skied the most difficult of the trails. Although plaintiff testified that his knee collapsed, the medical records of Dr. Agostini unequivocally state that the torn meniscus suffered was "unrelated" to the prior accident. Plaintiff's expert Dr. Hyman testified that he did not know about the skiing injury but that he accepted Dr. Agostini's findings. Hence, while Dr. Hyman discussed the atro-

phy in plaintiff's knee, the court must consider that at least part of plaintiff's current knee injury was the result of an unrelated intervening event. Thus, while the court accepts the real possibility that plaintiff may suffer future knee problems, the evidence demonstrates that any subsequent problems can, at best, only be partially attributed to the ferry accident. Finally, plaintiff is not currently under medical treatment for the knee and has not been treated since at least September 1993.

■ Accordingly, the court fixes an award at $35,000. In reaching this amount of compensation the court considered several factors. As previously discussed, plaintiff's knee injury, while significant, cannot be considered extreme. Considering the lack of long lasting effects on plaintiff but taking into account the suffering and expense he has already endured, as well as, the possibility of future problems which are at least partially attributable to the allision, the court believes $30,000 is an appropriate award. The court also finds that a smaller award in the amount of $5000 is justified to compensate plaintiff for the temporary head injury he suffered. The evidence demonstrates that although the effects of the head injury were temporary, they nonetheless did cause trouble for plaintiff for a period of at least two to three months. After striking his head plaintiff testified that he experienced difficulty producing his column, that he often noticed cognitive typing errors, and that he experienced tremendous anxiety as a result of this condition. Plaintiff concedes that after a period of time these symptoms disappeared. The court credits plaintiff's testimony regarding these problems. Although plaintiff lost no wages as a result of his injuries and his employers never detected a slip in the quality of plaintiff's work, the court finds that it was certainly reasonable for plaintiff to experience anxiety at the discovery that he was making unusual errors in his job performance. Thus, plaintiff should receive some degree of compensation for this period of time, *viz*, a relatively small award of $5000. All totaled, plaintiff's compensatory award amounts to $35,000. There is no dispute that plaintiff suffered injury as a result of defen-

dants' negligence, at the same time, the injury cannot be treated "as though it were a winning lottery ticket." *Nairn*, 837 F.2d at 568 (citations omitted); *Smith v. Delaware Bay Launch Service Inc.*, 842 F.Supp. 770, 781 (D.Del.1994). The court finds that this award fairly compensates plaintiff for the injuries he sustained as a result of the allision.

### B.

The court now addresses the question of whether consideration of punitive damages is appropriate in this case and if defendants' conduct would warrant such an award. Plaintiff alleges that defendants knew or should have reasonably known that because of a "dip" in the airline pipes that the Hamilton's pneumatic system would be subject to ice blockage. By allowing the ferry to embark with passengers while this condition existed, plaintiff argues defendants demonstrated wanton disregard of a safety hazard which should be classified as gross negligence. Defendants respond that, as a matter of law, punitive damages may not be awarded in an admiralty personal injury action. In the alternative, defendants additionally assert that they had no knowledge of a likelihood of a problem, that they complied with all applicable United States Coast Guard regulations, and their conduct did not rise to the level of gross negligence. For the following reasons the court finds that punitive damages are not available to plaintiff as a matter of law and moreover, even if such awards were permitted in this action, plaintiff has not demonstrated that defendants' actions warrant such a measure.

Prior to 1990, under some circumstances, courts had permitted punitive damage awards for torts committed under federal admiralty jurisdiction. *See e.g. In re Marine Sulphur Queen*, 460 F.2d 89, 105 (2d Cir. 1972) (in order to award punitive damages it must be shown that "defendant was guilty of gross negligence, or actual malice or criminal indifference which is the equivalent of reckless and wanton misconduct"). In 1990, however, the Supreme Court decided *Miles v. Apex Marine Corp*, 498 U.S. 19, 111 S.Ct. 317, 112 L.Ed.2d 275 (1990), casting doubt upon the ability to award punitive damages for torts grounded in maritime law. In *Miles*, the Supreme Court was faced with the issue of whether there could be recovery for loss of society in a general maritime action for the wrongful death of a Jones Act seaman. The High Court found that there could be no such recovery and stated, "[i]t would be inconsistent with our place in the constitutional scheme were we to sanction more expansive remedies in a judicially created cause of action in which liability is without fault than Congress has allowed in cases of death resulting from negligence." *Miles*, 498 U.S. at 32–33, 111 S.Ct. at 325–26. The Court reasoned that since the statutory Jones Act and Death on the High Seas Act ("DOHSA") permitted only pecuniary damages, recovery on an unseaworthiness claim should be similarly limited.

Plainly then, the Supreme Court did not permit seaman, as defined in the Jones Act, to receive damages under a general admiralty claim that could not be recovered under the Jones Act. There is also no question that the law of this circuit is that "[t]he language of the conclusion in *Miles* is not limited to Jones Act seamen." *Preston v. Frantz*, 11 F.3d 357, 358 (2d Cir.1993). The fact that plaintiff is not a seaman, as defined by the Jones Act, is of no moment. If the reasoning behind *Miles* is applicable to punitive damage awards, plaintiff in this case could not recover punitive damages as a matter of law.

The law relating to punitive damages in an admiralty case is not well settled. Although it has not definitively spoken to the issue, the Second Circuit is "in general agreement with the view that plaintiffs who are not allowed by general maritime law to seek nonpecuniary damages for loss of society should also be barred from seeking nonpecuniary punitive damages." *Wahlstrom v. Kawasaki Heavy Industries, Ltd.*, 4 F.3d 1084 (2d Cir.1993). In addition to the Second Circuit's belief that *Miles* precludes punitive damage claims in general maritime actions, the majority of District Courts which have addressed this issue are similarly of the view that the *Miles* decision precludes claims for punitive damages under the general maritime law in order to further uniformity between that law and the analogous federal statutes DOHSA and the Jones Act. *See e.g., CEH Inc. v. FV*

*"Seafarer"*, 148 F.R.D. 469, 472 (D.R.I.1993); *Boykin v. Bergesen D.Y.A/S*, 822 F.Supp. 324, 326 (E.D.Va.1993); *Ortega v. Oceantrawl, Inc.*, 822 F.Supp. 621, 623 (D.Alaska 1993); *In re Cleveland Tankers Inc.*, 791 F.Supp. 679, 680–82 (E.D.Mich.1992). It must also be noted, nevertheless, that some District Courts have found punitive damage awards proper despite the Supreme Court's ruling. *See e.g., Duplantis v. Texaco Inc.*, 771 F.Supp. 787 (E.D.La.1991); *Hannon v. Waterman Steamship Corp.*, 1991 WL 88012 (E.D.La.1991); *Davis v. Penrod Drilling Corp.*, 1991 WL 264541 (E.D.La.1991); *but see, Howard v. Atlantic Pacific Marine Corp.*, 1992 WL 55487, 1992 WL 55487 (E.D.La.1992) (acknowledging the contrary cases in the same district, but nonetheless ruling that punitive damages are not available for general maritime actions of Jones Act seaman in light of *Miles* ).

■ Each of those cases allowing punitive damage claims seek to distinguish *Miles* by asserting that punitive damages exists for the special purpose of preventing and punishing misconduct by parties [7]. As one court wrote, the nature of a punitive damage suit "is not a suit under the Jones Act, rather it comes under the general maritime law and includes allegations to the effect that [a plaintiff] willfully violated its duty." *Duplantis*, 771 F.Supp. at 788. Those courts allowing such awards reason that punitive damages are not the type of claim contemplated by the Supreme Court in *Miles*. This court finds such arguments unpersuasive. In order to accept this reasoning, a court must ignore the policy and reasoning set forth in

*Miles.* Indeed, those cases previously cited for the proposition that punitive damage awards are proper each ignores the heart of the *Miles* decision: when Congress has legislated in an area of maritime law, judicially created remedies must conform with that legislation. To allow a punitive damage claim would be to expand maritime jurisprudence beyond Congress' intention. The Supreme Court in *Miles* made no distinction regarding non-pecuniary damages; and therefore, there is no reasonable view that the *Miles* Court believed that punitive damages should be considered in a different light. Because such a distinction was not made, this court concludes that *Miles* bars plaintiff's claim for punitive damages.

■ Assuming, however, that punitive damages could be considered in this case, the evidence would positively not support such an award. For purposes of this analysis, even if the court were to accept plaintiff's contention that the loss of air pressure was the direct result of ice blockage in the pneumatic lines, the requisite level of recklessness to warrant punitive damages could not be established [8]. *E.g., In re Marine Sulphur Queen* 460 F.2d at 105 (in order for an award of punitive damages to be proper it must be established that the defendant "was guilty of gross negligence or actual malic, or criminal indifference which is the equivalent of wanton and reckless conduct"); *see also, Action S.A. v. Marc Rich & Co., Inc.*, 951 F.2d 504, 507 (2d Cir.1991) (punitive damages appropriate in cases involving gross fraud, willful or wanton negligence, and morally culpable conduct); *Miles v. Melrose*, 882 F.2d 976 (5th

---

7. With the exception of *Dopson v. Wilrig*, 1993 W.L. 192145 (E.D.La.1993), all of the cases cited by plaintiff to support his claim that punitive damages are permitted were either decided before *Miles* or do not address the issue raised by *Miles*. Considering that those cases have not grappled with the issue put forward by defendant, they are cases inapposite to the matter at bar. Plaintiff's reliance on *Dopson* is misplaced, in that the ultimate conclusion reached by that court was that *Miles* required a finding "that non-pecuniary damages, such as punitive damages, are unavailable to seaman." Thus, it appears that the more recent finding of the Eastern District of Louisiana agrees with the majority of District Courts which have found punitive damages to be unavailable.

8. It is not clear from the evidence what actually caused the vessel to lose total air pressure in its pneumatic lines on February 12, 1992. Plaintiff's and Defendants' experts unsurprisingly reach different conclusions. Moreover, although the report of the United States Coast Guard regarding this incident was admitted into evidence subject to review as to what portions were admissible, this court only relied upon the factual findings contained in the report and did not consider the investigator's opinions or conclusions. Fed.R.Evid. 803(8); *Beech Aircraft Corp v. Rainey*, 488 U.S. 153, 170, 109 S.Ct. 439, 450, 102 L.Ed.2d 445 (1988); *Strehle v. United States*, 860 F.Supp. 136, 138 (S.D.N.Y.1994). Since defendants concede negligence, it is not necessary for the court to reach a determination as to what actually caused the loss of air pressure.

Cir.1989) (relying on *In re Marine Sulphur Queen*); *Muratore v. M/S Scotia Prince*, 845 F.2d 347 (1st Cir.1988) (punitive damages appropriate where defendants actions were intentional, deliberate or so wanton or reckless so as to demonstrate a conscious disregard for the rights of others).

The evidence shows that on the morning of February 12, 1992, the Alexander Hamilton was started up by Silecchia. It appeared to be functioning normally and did, in fact, complete one trip from Hoboken to the WFC and back without incident. There was no indication of impending danger to the passengers of the ferry. Neither the Hamilton nor any of its sister ships ever experienced a total loss of pneumatic pressure once they were underway. Additionally, the Hamilton was routinely inspected by the United States Coast Guard, as well as the ABS. Although the evidence shows that any inspector could have observed the "dip" in the air line, never did either agency perceive the line to be a threat or in any way suggest to defendants that improvements should be made in the pneumatic system to prevent line freezing. Considering that the safety inspectors who made routine examinations of the Hamilton and its sister ships did not recognize that the "dipped" airline posed any cause for concern, the court cannot label defendants failure to perceive any risk as grossly negligence.

Finally, although plaintiff makes much about the fact that on two prior occasions the ferry could not be operated because after sitting in the water for the weekend, ice blocked the pneumatic lines, the court finds that those incidents were very different to the present case. Each prior occasion when ice blocked the pneumatic lines, the ferry was being started on a Monday morning after it had been sitting in cold water all weekend. The ferry was inoperable because air pressure in the pneumatic lines was blocked. After heat was applied to the blockage, the ferry was able to function without further incident. In the present case, the ferry suddenly failed after it was already in operation. It is simply not reasonable to conclude that the inability to start the ferry on a cold morning would signal to defendants that a total loss of pneumatic pressure while the ferry was underway was likely or possible. Accordingly, defendants' conduct does not rise to the level of willful or wanton indifference necessary to support a claim of punitive damages.

## CONCLUSION

With regard to plaintiff's claim the court finds defendants, who concede negligence, to be liable to plaintiff for personal injuries sustained in the allision. Plaintiff shall recover $35,000 in compensatory damages.

Further, plaintiff's claim for punitive damages is hereby dismissed.

Each side shall bear its own costs.

The Clerk of the Court is directed to enter judgment accordingly.

**IT IS SO ORDERED.**