■ JASON KARNEY, an Infant, by SHEILA KARNEY, His Mother and Guardian, Appellant-Respondent, v ARNOT-OGDEN MEMORIAL HOSPITAL, Respondent, and LAWRENCE DOLKART, Respondent-Appellant, et al., Defendants. [674 NYS2d 449] —White, J. (1) Cross appeals from an order of the Supreme Court (Ellison, J.), entered March 31, 1997 in Chemung County, which, *inter alia*, partially granted defendant Lawrence Dolkart's motion to set aside the verdict, (2) appeal from an order of said court, entered March 31, 1997 in Chemung County, which granted a motion by defendant Arnot-Ogden Memorial Hospital to set aside that portion of the verdict rendered against it, and (3) appeal from an order and judgment of said court, entered April 29, 1997 in Chemung County, which, *inter alia*, dismissed the complaint against defendant Arnot-Ogden Memorial Hospital.

At 9:50 A.M. on February 9, 1984, Sheila Karney, in the 28th week of her pregnancy, was admitted to defendant Arnot-Ogden Memorial Hospital (hereinafter the Hospital) because she had been experiencing vaginal bleeding. Her personal physician, defendant Lawrence Dolkart, saw her at 10:50 A.M. and ordered a sonogram. Following the completion of the sonogram, which was unremarkable, Karney was placed on the obstetrical floor for bed rest and observation. Although the

hospital record indicates that the first stage of Karney's labor began at 8:00 P.M., Joan Pirozollo, an obstetrical nurse and hospital employee, did not call Dolkart until 10:30 P.M. She recalled him at 11:00 P.M. to advise him that a fetal monitor showed that Karney was having contractions at five-minute intervals. Dolkart then went to the hospital where, at 11:45 P.M., he performed a vaginal examination that showed Karney's cervix had dilated to four centimeters. At that point, he administered Betamethasone to improve fetal lung maturity and Ritodrine to arrest labor.

The administration of these medications was stopped at 12:05 A.M. on February 10, 1984 when an examination revealed that Karney's cervix had increased in dilation to five centimeters. Karney's son, plaintiff herein, was delivered at 12:40 A.M., weighing two pounds, six ounces with an Apgar score of one at one minute. He was intubated and remained on ventilatory support virtually all the time he was at the hospital until his discharge in April 1984. At 15 months a diagnosis of cerebral palsy, spastic diplegia was made. This condition has left plaintiff unable to walk and almost totally dependent on others for his personal needs. Otherwise, his health has been good except for recurrent respiratory difficulties that have abated; his speech is basically normal and he exhibits normal intelligence.

After the trial of this medical malpractice action, the jury concluded that Dolkart had been negligent in failing, *inter alia*, to diagnose Karney's preterm labor and commence the administration of Ritodrine in a timely manner and that Pirozollo was negligent in failing to notify Dolkart of the change in Karney's status at an earlier time. It then apportioned liability 70% to Dolkart, 30% to the Hospital and awarded plaintiff a verdict of $13,629,000.* In response to defendants' motions to set the verdict aside, Supreme Court, in separate orders,

---

\* The jury itemized the verdict as follows:

| | | | |
|---|---|---|---|
| a. | Pain and suffering to date of verdict | $1,700,000 | |
| b. | Medical care | 75,000 | 60.6 years |
| c. | Impairment of earning ability | 2,000,000 | 38.9 years |
| d. | Laboratory work | 4,000 | 60.6 years |
| e. | Medical supply/equipment | 100,000 | 60.6 years |
| f. | Home equipment adaptions, transportation | 1,500,000 | 60.6 years |
| g. | Therapies | 2,000,000 | 60.6 years |
| h. | Home care/aid/attendant | 250,000 | 9.0 years |
| i. | Group home after age 21 | 4,000,000 | 51.2 years |
| j. | Pain & suffering, including the 2,000,000 60.6 years permanent effect of the injury from the time of this verdict to the time that plaintiff could be expected to live | | |
| | | $13,629,000 | |

dismissed the complaint against the hospital and granted Dolkart's motion to the extent of directing a new trial unless the parties stipulated and agreed to a $4,529,000 verdict. Plaintiff and Dolkart appeal.

Supreme Court could properly dismiss the complaint against the Hospital if there was "no valid line of reasoning and permissible inferences which could possibly lead rational [people] to the conclusion reached by the jury on the basis of the evidence presented at trial" (*Cohen v Hallmark Cards*, 45 NY2d 493, 499; *see, Colonno v Executive I Assocs.*, 228 AD2d 859, 861). Here, besides the hospital record indicating that Karney's labor began at 8:00 P.M., there is evidence that she had been complaining throughout the evening that her cramping was getting worse, a fact confirmed by Pirozollo in a 10:30 P.M. note that Karney "stated that cramping has been bothering her more as the evening has gone on". In addition, Dolkart's expert testified that the fact Karney's cervix went from being entirely closed when the sonogram was performed to four centimeters of dilation at 11:45 P.M. indicates that she was having contractions that were getting more frequent as the evening progressed. Viewing the evidence in the light most favorable to plaintiff and according him every favorable inference that can be reasonably drawn therefrom (*see, Baker v Turner Constr. Co.*, 200 AD2d 525, *lv denied* 83 NY2d 755; *Barker v Bice*, 87 AD2d 908), we cannot say that it was utterly irrational for the jury to conclude that Pirozollo knew or should have known of the change in Karney's status before 10:30 P.M. and should have notified Dolkart prior thereto. Therefore, we find that Supreme Court should not have dismissed the complaint against the hospital (*see, Campbell v City of Elmira*, 84 NY2d 505, 510).

Next, we turn to Supreme Court's disposition of Dolkart's posttrial motion. The amount of damages to be awarded is primarily a question of fact for the jury whose determination is accorded considerable deference (*see, Levine v East Ramapo Cent. School Dist.*, 192 AD2d 1025). Its role, however, is not unfettered since we may overturn a verdict where "it deviates materially from what would be reasonable compensation" (CPLR 5501 [c]; *see, Cochetti v Gralow*, 192 AD2d 974). Because personal injury awards, especially those for pain and suffering, are not subject to precise quantification (*see, Cochran v A/H Battery Assocs.*, 909 F Supp 911, 917), we look to comparable cases to determine at what point an award "deviates materially" from what is considered reasonable compensation (*see, Gasperini v Center for Humanities*, 518 US 415, 424-425). Mak-

ing this comparison, recent comparable cases have resulted in verdicts in the range of $6 to $9 million (*see, Nevarez v New York City Health & Hosps. Corp.*, 248 AD2d 307; *Rosa v New York City Health & Hosps. Corp.*, Sup Ct, Bronx County, Jan. 1997; *Depradine v New York City Health & Hosps. Corp.*, Sup Ct, Kings County, Apr. 1995). Accordingly, we agree with Supreme Court that the verdict is excessive; however, as will be developed, we do not concur in all of its reductions of the various elements of the award.

As the result of Supreme Court's determination, the $1.7 million award for past pain and suffering was reduced to $600,000. Our examination of comparable cases discloses that the maximum award for past and future pain and suffering has not exceeded $2 million (*see, Nevarez v New York City Health & Hosps. Corp., supra*; *Pay v State of New York*, 213 AD2d 991, 992, *revd on other grounds* 87 NY2d 1011; *Ebert v New York City Health & Hosps. Corp.*, 186 AD2d 621, 623, *mod on other grounds* 82 NY2d 863). Measured by these cases, the resulting $2.6 million award for past and future pain and suffering is excessive. Consequently, we shall lower it to $2 million by reducing the award for future pain and suffering to $1.4 million, leaving a total of $2 million for past and future pain and suffering.

In its verdict, the jury indicated that its awards for home equipment adaptations, transportation ($1.5 million) and therapies ($2 million) were intended to provide compensation for 60.6 years. Inasmuch as the jury concluded that plaintiff would be living in a group home after his 21st birthday, and as the record shows that the aforementioned items would be provided by a group home, these awards are duplicative. Therefore, Supreme Court properly reduced them to $300,000 and $200,000, respectively, which reductions comport with the opinion of plaintiff's economist as to what it would cost to provide these services to plaintiff to age 21.

The record evidence shows that over plaintiff's lifetime a group home would cost $3,784,928 without inflation, and $8,435,450 with a 2.6% inflation rate. We disagree with Supreme Court that the jury's award of $4 million is excessive in light of the foregoing quantitative evidence and plaintiff's acknowledged need for assisted living (*see, Cunningham v Vincent*, 234 AD2d 648, 652; *compare, Cramer v Kuhns*, 213 AD2d 131, 138-139, *lv dismissed* 87 NY2d 860).

In response to defendants' demand for expert witness information, plaintiff advised that his economist would testify as to his diminished earning power and that the economist's projec-

tions would be based on the earnings of high school and college graduates derived from statistical data published by the government and other reliable sources. Plaintiff also provided defendants with a copy of the economist's report which did not contain any information relating to plaintiff's diminished earning power. At trial, over defendants' objections, Supreme Court permitted the economist to testify on this subject. Upon consideration of the posttrial motions, the court reversed its position and set aside the jury's $2 million award for impairment of earning ability.

We agree with Supreme Court that plaintiff's response was inadequate as it did not set forth in reasonable detail the facts and opinions on which the economist was expected to testify or a summary of the grounds for his opinion (*see, Chapman v State of New York*, 227 AD2d 867). Therefore, since plaintiff did not provide good cause for his failure to serve an adequate notice, the court properly exercised its discretion which we note is particularly broad in medical malpractice cases (*see, Tleige v Troy Pediatrics*, 237 AD2d 772, 774; *Ingleston v Francis*, 206 AD2d 745; *Cramer v Spada*, 203 AD2d 739, *lv denied* 84 NY2d 809, *cert denied* 514 US 1055).

We have examined the remaining elements of the award and find them reasonable. Thus, to summarize, we find that the verdict was excessive and should be reduced to $6,929,000.

Mikoll, J. P., Mercure, Crew III and Yesawich Jr., JJ., concur. Ordered that the order entered March 31, 1997 and order and judgment entered April 29, 1997 are reversed, on the law, with costs, and defendant Arnot-Ogden Memorial Hospital's motion to set aside the verdict against it denied. Ordered that the order entered March 31, 1997 is modified, on the facts, with costs to plaintiff, by changing the amount of the verdict that plaintiff must stipulate to in order to avoid a new trial from $4,529,000 to $6,929,000. [As amended by unpublished order entered Sept. 10, 1998.]