Doe v Merck & Co. (2002 NY Slip Op 50717(U))

[*1]

Doe v Merck & Co.

2002 NY Slip Op 50717(U)

Decided on May 30, 2002

Supreme Court, Suffolk County

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on May 30, 2002

Supreme Court, Suffolk County
 JANE DOE, Plaintiff, - -
against
MERCK & CO., INC., HARRISON & STAR, INC., Defendants.
INDEX # 10786/1998

Tranfo & Tranfo, LLC
By: Joseph A. Tranfo, Esq.
Meridith C. Braxton, Esq.
Attorney for Plaintiff
19 Benedict Place
Greenwich, Connecticut 06830
Davis, Wright, Tremaine, LLP
By: Victor A. Kovner
Davis & Gilbert, LLP
Attorney for Defendant
1740 Broadway
New York, NY 10019

ALAN D. OSHRIN, J.
The matter first came before this Justice for a trial on the issue of damages on the plaintiff s claims of libel and violations of sections 50 and 51 of the Civil Rights Law. A jury trial was conducted on September 10, 11, 12, 13, 14, 17, 20, 21, 24, 25, 26 and 28, 2001. On September 25, 2001, the jury awarded as against the defendants Merck & Co., Inc. (hereinafter "Merck") and Harrison & Star, Inc. (hereinafter "Harrison & Star") the sum of $1,000,000 on the libel claim and $1,000 on the Civil Rights claim for compensatory damages. The jury also found that the plaintiff is entitled to punitive damages on her libel claim. On September 28, 2001, the jury awarded as punitive damages the sum of $1,750,000 as against Merck, and $250,000 as against Harrison & Star.
The defendants, Merck and Harrison & Star, jointly move pursuant to CPLR 4404 to vacate the jury verdict for punitive damages against each defendant as a matter of law arguing that the evidence fails to establish common law malice. This motion was essentially in furtherance of the defendants motion at trial for a directed verdict with respect to which the Court reserved decision until the Court had an opportunity to review the transcript. The Court indicated that continuation of the case was without prejudice to any ruling the Court may ultimately make. The defendants also moved to reduce the jury verdict for compensatory [*2]damages against the defendants on the ground that the award deviated materially from what would be reasonable compensation. The Court will first address the motion as to punitive damages.
In defamation cases in New York, punitive damages may be assessed only if the plaintiff establishes common law malice, consisting of hatred, ill will, spite, criminal mental state or a wilful, wanton and deliberate disregard of the interests of others (see Prozeralik v. Capital Cities Communs., Inc., 82 NY2d 466, 605 NYS2d 218 [19931). Common law malice focuses on the defendant s mental state in relation to the plaintiff, and the motive in publishing the falsity (see Prozeralik v. Capital Cities Communs., Inc., 82 NY2d 466, supra).
Punitive or exemplary damages are seemingly attuned to the criminal rather than the civil side of the law and are not intended to compensate the injured party, but to punish the tortfeasor for his conduct and to deter him, and others like him, from similar action in the future (see Sharapata v. Town of Islip, 56 NY2d 332, 452 NYS2d 347 [1982]). Not only do they differ in purpose and nature from compensatory damages, but they may only be awarded for exceptional misconduct which transgresses mere negligence, as when the wrongdoer has acted "maliciously, wantonly or with a recklessness that betokens an improper motive or vindictiveness", or has engaged in "outrageous or oppressive intentional misconduct" or with "reckless or wanton disregard of safety or rights" (see Sharapata v. Town of Islip, 56 NY2d 332, supra). The nature of the conduct which will justify an award of punitive damages has been variously described as conduct having a high degree of moral culpability (see e.g. Home Ins. Co. v. American Home Prods. Corp., 75 NY2d 196, 551 NYS2d 481 [1990]; Giblin v. Murphy, 73 NY2d 769, 536 NYS2d 54 [1988]; Sweeney v. McCormick, 159 AD2d 832, 552 NYS2d 707 [1990]); or conduct activated by an evil and reprehensible motive which manifests a conscious disregard of the rights of others or conduct so reckless as to amount to such disregard (see e.g. Welch v. Mr. Christmas, Inc., 57 NY2d 143, 454 NYS2d 971 [1982]; Zabas v. Kard, 194 AD2d 784, 599 NYS2d 832 [19931; Sweeney v. McCormick, 159 AD2d 832, supra); or actions which constitute gross recklessness or intentional wanton or malicious conduct (see e.g. Bovkin v. Mora, 274 AD2d 441, 711 NYS2d 904 [2000]; Zabas v. Kard, 194 AD2d 784, supra); or actions which constitute willful or wanton negligence or recklessness (see e.g. Home Ins. Co. v. American Home Prods., Corp., 75 NY2d 196, supra; Giblin v. Murphy, 73 NY2d 769, supra; Sweeney v. McCormick, 159 AD2d 832, supra);or conduct which is grossly negligent and reckless (see e.g. Giblin v. Murphy, 73 NY2d 769, supra); or conduct which is so flagrant as to transcend mere carelessness (see e.g. Zabas v. Kard, 194 AD2d 784, supra; Frenya v. Champlain Valley Phys. Hosp. Med. Ctr., 133 AD2d 1000, 521 NYS2d 150 [1987]).
It has long been said that although the jury is the constitutional tribunal to decide disputed facts, the court need not submit every question of fact to their decision as a matter or course, if the party holding the affirmative has failed to introduce sufficient evidence in point of law to authorize the jury to give a verdict in his favor (see Blum v. Fresh Grown Preserve Corp., 292 NY 241 [1944]). It is the duty of the court, if requested by the defendant to do so, to non suit the plaintiff, where the testimony is all on one side, and where it is wholly insufficient to sustain the suit (see Blum v. Fresh Grown Preserve Corp., 292 NY 241, supra). A court is justified in directing a verdict where there is an actual defect of proof and, as a matter of law, the party is not entitled to recover (see Blum v. Fresh Grown Preserve Corp., 292 NY 241, supra). The court may grant a motion for judgment as a matter of law where there is no rational process by which the jury could find for the plaintiff (see Lyons v. McCauley, 252 AD2d 516, 675 NYS2d 375 [1998] [*3]lv app den 92 NY2d 814, 681 NYS2d 475 [1998]; Farrukh v. Board of Educ. of City of New York, 227 AD2d 440, 643 NYS2d 118 [1996]). In the matter at bar, the defendants argue that the plaintiff has not established common law malice. On the motion the Court has read the trial transcripts for the testimony of the plaintiff, Brent Olson, Scott Shevrin, Jeffrey Halpern, Marjorie Vincent, Robin Heagan, Keith Lewis, Deborah Steinhart, Jill Hutton, Domenica Nella Palmieri, Jane Matchett, James Robert Labbe (from EBT), Janine Budah, Dr. Derevenco, Dr. Anderson and Dr. Dobkin.
Keith Lewis was the President of the Morgan Agency, a model and talent agency which contacted models in connection with the Merck project. Mr. Lewis testified that he acted as the plaintiffs agent and the agent of all other models on the project; that he was authorized to act on the plaintiffs behalf, and that a release is inclusive in the model s contract. Mr. Lewis testified that the plaintiff was advised of the roles to be cast; how to dress for the audition, and the use of materials of which her photograph would be a part. Mr. Lewis also testified that he and the plaintiff spoke about the "functionally sexually active smart enough for college trendy role".
Brent Olson is in-house counsel for Merck. Mr. Olson testified that after receipt of the letter from Patricia Manzo, Esq., he had every reason to believe that Merck had the model actress permission to use her photograph in the brochure; that the advertising agency was responsible for obtaining the consents, and that Keith Lewis told him that he had obtained permission from all of the models including "Jane Doe". Mr. Olson testified that he believed that he had consent from the plaintiff but would reprint the brochure without the plaintiffs photograph as an accommodation to Ms. Manzo and her client. When questioned on efforts made to obtain or retrieve brochures after the Manzo letter, Mr. Olson testified that he thought Merck had the plaintiff s permission and that they intended to reissue the brochure without her picture. When questioned on whether a "consent" went to the Getting the Facts Flip Chart and not the Sharing Stories brochure, Mr. Olson testified that Keith Lewis told him that he had given permission for that biography to be used in the brochure and the brochure was approved by him as agent. When questioned as to the distribution of Sharing Stories after September 4, 1997, Mr. Olson testified that after September 4, there was no distribution to the field and only to headquarters personnel; that he advised Matt Shimkus to pull all brochures from the shelves and to make sure that brochures could not be distributed in the field, and that the brochures were pulled from OAN (Order as Needed).
Deborah Steinhart was a Senior Art Director at Harrison & Star. Ms. Steinhart testified that at the photo shoot she showed the plaintiff a dummy comp of Sharings Stories; that she told the plaintiff and showed the plaintiff that the plaintiff was going to be "Maria"; that the plaintiff looked at the comp; that the plaintiff knew that she was playing a type; that the plaintiff knew she was cast for the Hispanic person, and that the plaintiff learned that the brochure was for Crixivan. Ms. Steinhart acknowledged that she did not specifically tell the plaintiff that her photograph would be next to a fictitious biography. Ms. Steinhart testified that Skip Hines was directed to tell the models at the casting audition that fictitious biographies would be used next to the photographs. Ms. Steinhart testified that she never personally checked on the releases; that she never checked with Robin Heagan on the releases, and that she assumed it was a detail that had been taken care of.
Marjorie Vincent is a Senior Vice President Associate Creative Director at Harrison & Star. Ms. Vincent testified that she meant to include the term "composite" in the brochure to protect the models privacy. Ms. Vincent testified that it was the responsibility of Harrison & [*4]Star to obtain releases and consents from any third parties.
Scott Shevrin was a Vice President Group Accounts Supervisor at Harrison & Star in 1996. Mr. Shevrin testified that the brochure was meant to be composites of a number of patients who had been interviewed and that it was Harrison & Star s mistake that the language was missing from the brochure. Mr. Shevrin testified that it is Harrison & Star s procedure to make sure that it had proper releases from all models that they intend to use in any material, and that it was a mistake that this was not done. Mr. Shevrin testified that the text was prepared long before the models were selected; that it was Harrison & Star s responsibility to obtain the consents, and that at the time the brochure was in its final form he believed he had the plaintiffs consent.
Jeffrey Halpern was a copy supervisor at Harrison & Star in 1996. Mr. Halpern testified that the descriptions of individuals in the brochure were composites of statistics of HIV positive patients and were not meant to be a particular person; that the composites were based upon Center for Disease Control (CDC) statistics and demographics, and that the fact that the "composite" language was missing from the final draft was his mistake. Mr. Halpern testified that it was not his job to get a consent, that he believed he had the plaintiffs consent, and that he would not have released the brochure for production if he thought it had not been consented to.
Robin Heagan was a Creative Service Manager at Harrison & Star in 1996. Ms. Heagan testified that it was her responsibility to get releases or consents from models; that she assigned that responsibility to the photographer, Skip Hines, and that Harrison & Star did not follow-up on the consents.
Jill Hutton was a Promotion Manager for Crixivan at Merck in 1996. Ms. Hutton testified that the biographies were written long before the photographs were taken. Ms. Hutton testified that it was assumed that Harrison & Star did its job regarding permission from the models, and that she had no reason to doubt that the consents were obtained by Harrison & Star.
The plaintiff testified that she was shown a flip chart at the photo shoot by Skip Hines; that neither Skip Hines or Deborah Steinhart told her that there would be text next to her photograph; and that no one told her that she would play a character "Maria". The plaintiff testified that she did not sign a release at the photo session; that she signed a contract after the photo shoot; that she did not receive a model release until February or March, 1998; that the model release came with a check as a single piece of paper; that this was the second check from the Morgan Agency, and that she did not sign the release. The plaintiff testified that she was not told about casting types but acknowledges that Ms. Steinhart said she looked Hispanic.
It is evident that the creation of the Sharing Stories brochure was a significant undertaking involving a number of representatives of Merck and Harrison & Star. It is also evident that some representatives had overlapping responsibilities while others had quite divergent responsibilities. In no event did a single individual from either entity oversee all tasks performed by such entity. And, in no event did a single representative of Merck oversee all tasks performed by both entities.
With respect to the issue of consent, the Court makes the following observations. Mr. Lewis testified that he acted as the plaintiff s agent and that he was authorized to act on the plaintiff s behalf. Mr. Lewis testified that a release is inclusive in the contract. Mr. Olson testified that Mr. Lewis told him that he had obtained permission for all models including the plaintiff. Mr. Olson testified that Mr. Lewis told him he had given permission for the biography to be used in the brochure, and that the biography was approved by him as agent. There may have been some confusion regarding there being consent for the Flip Chart, but not for Sharing [*5]Stories.
There were a number of individuals at both Merck and Harrison & Star who worked on this project. A number of individuals testified that it was not their job to obtain releases or consents. A number of individuals testified that they assumed consents or releases had been obtained, or had no reason to believe that consents or releases had not been obtained. Ms. Vincent and Ms. Heagan testified that it was Harrison & Star s responsibility to obtain releases or consents. Ms. Heagan testified that she assigned that responsibility to the photographer, Skip Hines, and that Harrison & Star did not follow-up. There is sufficient evidence in the record, such that it is not unreasonable that representatives of Merck and Harrison & Star believed that consents or releases had been obtained prior to the release of the Sharing Stories brochure for printing and distribution
With respect to the issue of a "composite" notation the Court makes the following observations. Ms. Vincent testified that she meant to include the "composite" language to protect the privacy of the models. Mr. Halpern testified that the brochure was always meant to be a composite; that a number of drafts were created and revised over a considerable period of time; that the composite language was meant to be in the final draft, and that it was a mistake that the language was missing from the final draft. There was also testimony from several witnesses that the text of the Sharing Stories brochure was prepared long before models were selected and their photographs included.
With respect to the actions after the letter of Patricia Manzo, Esq., the Court makes the following observations. Mr. Olson testified that he believed there was consent from the plaintiff, but that Merck would reprint the brochure without the plaintiff s photograph as an accommodation to the plaintiff. There was no distribution of Sharing Stories to the field after September 4, 1997, but only to headquarters personnel. The brochures were pulled from OAN. Mr. Olson testified that they believed they had consent and that after his conversation with Mr. Lewis regarding his permission for the biography to be used in the brochure and that the brochure and biography was approved by him, as agent, they were reassured that they had consent. For this reason, Merck did not attempt to retrieve brochures already distributed. Mr. Olson also acknowledged that he was not sure there was a mechanism to accurately locate and retrieve the brochures. Merck did, in fact, take remedial action after the Manzo letter even though it believed it had consent. Distribution to the field was stopped. Merck agreed to reprint the brochure without the plaintiff s photograph.
The Court finds that any conduct in not ensuring that the plaintiff s consent had been obtained, any conduct in not ensuring that the "composite" language was contained in the final draft of Sharing Stories, and any actions taken or not taken after the Manzo letter, whether taken separately or together, may constitute carelessness or negligence but does not rise to the level of hatred, ill will, spite, criminal mental state or willful wanton and deliberate disregard of the interests of others to establish common law malice, the predicate for punitive damages (see Prozeralik v. Capital Cities Communs., Inc., 82 NY2d 466, supra). Similarly, the conduct does not rise to the level of gross recklessness (see Zabas v. Kard, 194 AD2d 784, supra) willful or wanton negligence or recklessness (see Home Ins. Co. v. American Home Prods. Corp., 75 NY2d 196, supra) or gross negligence (see Giblin v. Murphy, 73 NY2d 769, supra) as to justify an award for punitive damages. The conduct discussed is not so flagrant as to transcend mere [*6]carelessness (see Zabas v. Kard, 194 AD2d 784, supra; Frenya v. Champlain Valley Phys. Hosp. Med. Ctr., 133 AD2d 1000, supra). Punitive damages may not be awarded in a case where there is only negligence or poor judgment on the part of the defendant (see Meehan v. Snow, 494 F. Supp 690 [1980]; Nunan v. Bullman, 256 App Div 741, 12 NYS2d 51 [1939]).
Accordingly, a granting of the defendants motion for a directed verdict and to vacate the jury s verdict for punitive damages as a matter of law, on the basis that the plaintiff has failed to establish common law malice, the predicate for punitive damages, is warranted.
The Court will next address the defendants motion to reduce the jury s award for compensatory damages. The plaintiff testified that she was devastated when in 1993 she first learned that her husband and she were HIV positive when she was 32 weeks pregnant; that her son was born HIV positive; that she left her husband; that her father died in March of 1994 after a long illness; that she was unable to maintain the family dry cleaning business, and that she went on Welfare and Social Security Disability. The plaintiff testified that in 1995 she started with therapy and medication and attended a support group, PWAC; that in the Spring of 1997 she was feeling good, was feeling better emotionally and was socializing. The plaintiff testified that in August of 1997 when she first learned of the Sharing Stories brochure at PWAC she was horrified; that people were making comments and that made her very uncomfortable, and that she took a case of brochures from PWAC. The plaintiff testified that in August, 1997 she felt dirty; lost self esteem and self respect; went back into depression; was embarrassed to go out in public; became withdrawn again, and thought that people believed the biography.
The plaintiff acknowledged that although the ad affected her, she could not separate feelings that derive from the ad and feelings that derive from other events. When asked if the publication of the ad had an affect on the outlook for the future the plaintiff responded "for a while it did". The plaintiff testified that the ad affected her effort to find a job for a while but that she began working again in February, 1999. The plaintiff testified as to good things in her life; that she remarried, and that she had a healthy baby. The plaintiff acknowledges that after seeing the Sharing Stories brochure her mother told her that its "not a bad picture of you" and that "it wasn t very nice but its just an ad". The plaintiff testified that in October, 1997 she went to Florida and Disney World with her son, mother and mother-in-law because of the Make-A-Wish Foundation, and that it was a good experience. The plaintiff testified that she spoke publicly at schools in April of 1998.
Domenica Nella Palmieri, an Administrative Assistant at PWAC testified that after reading what was said about her in the ad the plaintiff was appalled, upset, and embarrassed. Ms. Palmieri testified that people would ask her if what they read in the biography was true and that she did not believe it to be true.
Jane Matchett, the plaintiff s former mother-in-law, testified that she had a good relationship with the plaintiff; that the plaintiff was horrified when she saw the ad; that her general demeanor changed; that her way of day to day living changed, and that she became withdrawn and depressed. Ms. Matchett also testified that after the ad the plaintiff was very depressed, did not eat, and looked as if "she had kind of given up".
Certain deposition testimony of James Robert Labbe was offered by the plaintiff. Mr. Labbe was acquainted with the plaintiff through PWAC. Mr. Labbe testified at his deposition that he believed that the situations that he read in the brochure were accurate; that he did form an opinion about the plaintiff before he actually met her; that he got the impression that she was sexually active; promiscuous; a slut; a troubled individual, and irresponsible. Mr. Labbe testified [*7]that speaking about the brochure made the plaintiff uncomfortable and that as he got to know the plaintiff better he realized that what he read did not accurately portray the plaintiff. Mr. Labbe testified that over time he no longer thought that the plaintiff was a slut and that he came to believe that "she was a "very good girl" and "a very loving mother".
Janine Budah is a social worker and therapist who treated the plaintiff when she was a social work intern at the Pederson Krag Center. The plaintiff was Ms. Budah s first patient. Ms. Budah testified that after the ad the plaintiff was agitated, upset, tearful, crying, and very distressed, and that they discussed the ad on three or four occasions. Ms. Budah testified that the ad was a significant turning point backwards at a point when the plaintiff was actually making some progress. Ms. Budah described the plaintiff s psychological symptoms after the ad was published as not being able to sleep; not being able to eat; not wanting to do anything; feeling sad; staying at home and crying, being tearful; being very guarded; being not trusting and not being able to express herself. Ms. Budah testified that the plaintiff was a difficult patient because she is not very talkative; not very expressive and that she is very private and very shy. When asked if the plaintiff made an effort to put herself back together after the ad, Ms Budah responded yes and indicated that a turning point was the trip to Disney World with her son because of the Make-A-Wish Foundation.
Ms. Budah testified that the plaintiff did not attend or call to cancel their August 21, 1997 session; that she called the plaintiff and the plaintiff told her that she was feeling good and was busy socially. Ms. Budah testified that at the September 4, 1997 session the plaintiff expressed concern that she was becoming hard and distrustful of people; that the plaintiff reported doing well in most respects, and that the plaintiff appeared relaxed and introspective. A discussion was had of Dr. Finkelstein s September 5, 1997 note which indicated that the plaintiff was feeling better; that her son was doing well; that she was less fatigued; that she went back to the gym; that she was not suicidal; that there is no depression, and that the plaintiff spoke about her recent upset with an ad that she was in.
Ms. Budah testified regarding the September 18, 1997 session that the plaintiff seemed very agitated and angry, particularly at her mother. Ms. Budah testified regarding the November 6, 1997 session that the plaintiff started having several weeks of optimism and hopefulness; that she raved about a week in Florida at Disney World; that it renewed her sense of faith and the good in people; that she was re-evaluating issues of trust which she has long felt cynical about, and that for the first time she could see a future. Ms. Budah testified regarding the December 4, 1997 session that the plaintiff contrasted her feelings of restored faith in humanity with her rage at people who were mean and thoughtless, and that she discussed her trouble expressing negative feelings.
Dr. Maria Derevenco, a clinical psychologist, testified as the plaintiffs expert witness. Dr. Derevenco testified that she diagnosed the plaintiff as suffering from recurrent major depression; that the plaintiff was socially isolated; that the plaintiff was in a period of crisis from 1993 to 1995; that the plaintiff began making progress in the beginning of 1996; that the plaintiff was working hard towards returning to a normal life, and that the plaintiff was developing a positive outlook and was socializing.
Dr. Derevenco testified that in February of 1997 when the plaintiffs son developed neurological symptoms of HIV she became suicidal again, and that in July of 1997 when the plaintiff s son was doing better she felt better and was more upbeat. Dr. Derevenco testified that in August of 1997, after the ad, the plaintiff stopped seeing people; became quite depressed; was [*8]mortified; had high feelings of shame; was becoming hard and distrustful of people; and that in September of 1997 the plaintiff stopped going to therapy and cancelled a number of appointments.
Dr. Derevenco testified that because of the ad the plaintiff suffered "enormous humiliation from the eyes of the people that she was working with"; that she felt unwelcome at PWAC; that she decreased her socialization; that she became mistrustful and that she was unable to relate to people even in her family. It was the doctor s opinion that "those effects are still felt today". When asked about any lingering effects to this ad for the plaintiff, Dr. Derevenco testified that the plaintiff has not recovered; that her emotional progress has essentially stopped, and that she is "as ashamed as if having an illness as she was probably the week after she was diagnosed". Dr. Derevenco testified that none of these lingering effects, in her opinion, were attributable to her initial diagnosis of HIV or her son s diagnosis with HIV because the plaintiff has already reacted to and gotten passed such events and had "returned to normal and was functioning at as good a level as can be expected".
Dr. Derevenco testified that none of these lingering effects, in her opinion, were attributable to continuing health threats facing her son; continuing health threats facing herself; the loss of her father; the loss of her father s business; going on public assistance and receiving disability benefits, conflict with her mother, except in a minimal way. Dr. Derevenco did acknowledge that the level of depression and/or agitation the plaintiff experienced could be affected by medication and dosage and changes in medication and dosage. Dr. Derevenco also acknowledged that the plaintiffs bad reaction to Crixivan was a source of emotional distress.
Dr. Douglas Anderson, a forensic psychiatrist, testified as the defendants expert witness. When asked his opinion, Dr. Anderson testified that it was his opinion "that the publication of the Crixivan brochure was upsetting for the plaintiff for a period not to exceed a maximum of two months but that it caused no psychological damage either in the short term or in the long term". This opinion was based primarily on the review of medical records. Dr. Anderson testified the ups and downs, dips, was the course of the plaintiff s therapy throughout; that one of these "notches" may have been the Crixivan brochure; that the plaintiff was really angry and embarrassed about it, and that "she wasn t psychologically damaged or diagnosed with any kind of mental illness as a result". Dr. Anderson testified that the medical records clearly indicate that at least two months beyond the plaintiff s viewing the brochure that she was at her "best place"; that she was described by Dr. Finkelstein in October of 1997 as doing well; the best that she had ever been and that she "essentially stayed there until I met her in 1999".
The jury awarded the plaintiff $1,000,000 for compensatory damages. Compensatory damages consisting of injury to the plaintiffs reputation and the humiliation and mental anguish in her public and private life which was caused by the defendants statement. The amount of damages to be awarded is primarily a question of fact for the jury whose determination is to be given considerable deference (see Britvan v. Plaza at Latham. LLC, 266 AD2d 799, 698 NYS2d 759 [1999]; Karney v. Arnot-Ogden Mem. Hosp., 251 AD2d 780, 674 NYS2d 449 [1998] rearg gr — AD2d —, 688 NYS2d 923 [1998] mot lv app dsmd 92 NY2d 942, 681 NYS2d 470 [1998]; Fares v. Fox, 198 AD2d 396, 603 NYS2d 892 [1993]; Levine v. East Ramapo Cent. Sch. Dist., 192 AD2d 1025, 597 NYS2d 239 [1993]). A trial court may, however, overturn a jury s award of damages in a personal injury action when it deviates materially from what would be considered reasonable compensation (see Britvan v. Plaza at Latham, LLC, 266 AD2d 799, supra; Parros v. 1500 Realty Co., 226 AD2d 607, 641 NYS2d 372 [1996]; Prunty v. Lockport. Inc., 206 AD2d [*9]911, 616 NYS2d 117 [1994]; Wendell v. Supermarkets Gen. Corp., 189 AD2d 1063, 592 NYS2d 895 [1993]; CPLR 5501[c]). Although juries have a great deal of discretion in awarding damages for pain and suffering including emotional distress, a court may not sustain an award which it deems so excessive as to suggest that it is motivated by "passion or prejudice" rather than a reasoned assessment of the evidence of injury presented at trial (see Bick v. The City of New York, 1998 US Dist. Lexis 5543; Ramirez v. New York City Off-Track Betting Corp., 112 F3d 38 [1997]; Shea v. Icelandair, 925 F. Supp 1014 [1996]).
It has been said that because personal injury awards, especially those for pain and suffering, are not subject to precise quantification, the courts may look to comparable cases to determine at what point an award "deviates materially" from what is considered reasonable compensation (see Karney v. Arnot-Odgen Mem. Hosp., 251 AD2d 780, supra citing Cochran v. A/H Batten Assocs., 909 F. Supp 911 [1995] and Gasparini v. Center for Humanities. Inc., 518 US 415 [1996]). It has also been said that the amount of damages awarded or sustained in cases involving similar injuries are not, in any way, binding upon the courts in the exercise of their discretion (see Senko v. Fonda, 53 AD2d 638, 384 NYS2d 849 [1976]). Inasmuch as in no two cases are the quality and quantity of damages identical, each case must be evaluated upon its own evidence (see Capara v. Chrysler Corp., 52 NY2d 114, 436 NYS2d 251 [1981]). The courts which have compared the present "deviates materially" standard from the former "shock the conscience" standard have held that the deviates materially standard calls for closer surveillance than shocks the conscience oversight, and that under the new standard, the reviewing court is given greater power to review the size of the jury award than had heretofore been afforded (see Gasparini v. Center for Humanities, Inc., 518 US 415, supra discussing O Connor v. Graziosi, 131 AD2d 553, 516 NYS2d 276 [1987]; Harvey v. MazolAM. Partners, 79 NY2d 218, 581 NYS2d 639 [1992]; Consorti v. Armstrong World Indus. Inc., 72 F3d 1003 [1995]).
The Court has reviewed the case authority offered by the defendants in support of their argument that the damage award is excessive and what the appropriate measure of damages should be. To a large extent the defendants comparable cases are not defamation cases, but employment discrimination cases based upon agency rulings. They are offered as comparable only insofar as they pertain to compensatory damages for pain and suffering (humiliation, mental anguish). Many of the cases offered by the defendants are cases where only the plaintiff testified without medical evidence or testimony in support or without evidence of treatment; where the court found that the plaintiffs testimony as to mental anguish was vague or conclusory; where the court found insufficient evidence regarding duration, severity or effects of depression; or where the court found scant evidence of emotional distress. The defamation cases offered by the defendants are cases where the evidence of pain and suffering was weak or not extensively discussed by the court.
The Court has reviewed the case authority offered by the plaintiff. Most of the cases offered go to the basic principles, discussed above, as to the court s function rather than the quality or quantity of proof necessary to sustain a jury verdict in a defamation case. The plaintiff also argued to distinguish the defendants cases.
The Court has extensively discussed the testimony and evidence as pertains to the plaintiffs pain and suffering. As in all cases, the evidence is not so weak as the defendants may urge nor so strong as the plaintiff would hope. The Court finds that there is sufficient evidence as to the affect of the Sharing Stories brochure upon the plaintiffs psychological, emotional and overall well being as to warrant a substantial award. The Court notes that the plaintiffs experts [*10]attributing little or none of the plaintiffs present emotional and mental state to anything but the Sharing Stories brochure warrants concern, given the number of significant negative events in the plaintiffs life and Dr. Derevenco s diagnosis that the plaintiff is suffering from recurrent major depression. The Court also notes that the defendants expert, who met with the plaintiff on one occasion for no less than thirty minutes and no more than one hour, based his opinion primarily on the medical records. Dr. Anderson s opinion that the brochure was upsetting to the plaintiff for a period not to exceed a maximum of two months and that it caused no psychological damage either in the short term or the long term could be found by a jury to be unpersuasive.
Notwithstanding the conflicting evidence and that issues of witness credibility and interpretation of the evidence are for the jury, the Court finds that there is not sufficient evidence in this record to support a jury s award of $1,000,000 for humiliation, mental anguish and harm to reputation and that the award is excessive in some degree due to passion, prejudice or sympathy rather than a reasoned assessment of the evidence of injury (see Bick v. The City of New York, 1998 US Dist. Lexis 5543, surpa; Ramirez v. New York City Off Track Betting Corp., 112 F3d 38, supra; Shea v. Icelandair, 925 F. Supp 1014, supra). Considering deference to the jury award, the quantum of proof; the fact that personal injury awards, especially those for pain and suffering, are not subject to precise quantification, and the presence of passion or prejudice, the Court finds that the award deviates materially from what would be reasonable compensation, and that the sum should be reduced to $650,000.
Accordingly, unless the plaintiff files a written stipulation consenting to reduce the verdict on the issue of compensatory damages from $1,000,000 to $650,000, with the Clerk of the Supreme Court, Suffolk County within 30 days of the date of this memorandum decision and accompanying order, a new trial on the issue of compensatory damages only will be granted (see Lind v. City of New York, 270 AD2d 315, 705 NYS2d 59 [2000]; Abellard v New York City Health & Hosps. Corp. 264 AD2d 460, 694 NYS2d 163 [1999]).
SHORT FORM ORDER SIGNED SIMULTANEOUSLY HEREWITH.
Decision Date: May 30, 2002