OPINION OF THE COURT
Alice Schlesinger, J.
Plaintiffs commenced this medical malpractice action in May of 2004 alleging that Beth Israel Medical Center and Orli Danger, M.D. were negligent in their treatment of Cindy Lugo during her labor and delivery of Nyisha Lugo at Beth Israel in January 2002, causing the infant severe injury. Plaintiffs discontinued the action against Dr. Danger and settled the matter with Beth Israel for $3,500,000 in open court on February 15, 2006. The matter came before this court again on May 17, 2006 for a conference on plaintiffs’ proposed infant compromise order. In addition to plaintiffs’ counsel, counsel for the Department of Social Services of the City of New York (DSS) appeared at the conference in connection with its lien totaling $47,349.58. The court also had before it the following documents received before the conference: an affirmation from plaintiffs’ counsel John E. Fitzgerald, dated April 17, 2006, supported by an affidavit from plaintiff Cynthia Lugo and various exhibits; the May 15, 2006 affirmation of Richard H. Dreyfuss, counsel for DSS, raising certain objections to the proposed order; and the May 16, 2006 reply affirmation of plaintiffs’ counsel Brian J. Farrell. The competing affirmations addressed significant issues related to the May 1, 2006 decision by the United States Supreme Court entitled Arkansas Department of Health and Human Services v Ahlborn (547 US —, 126 S Ct 1752 [2006]). Following that conference, both parties supplemented their papers, DSS by letters dated June 16, June 22, and June 29, 2006, and plaintiffs by a letter dated June 16, 2006 offering a proposed revised infant compromise order and by a letter dated June 23 offering a further affirmation from plaintiffs’ counsel John M. Daly. The defendant took no position on the issues raised and waived its participation.
On July 5, 2006, this court signed a revised infant compromise order. This decision determines certain issues raised by the parties related to the order, namely, (1) whether DSS, which provided Medicaid benefits to Nyisha Lugo for medical services rendered for injuries related to this case, can recoup those expenditures in their entirety from Lugo’s settlement proceeds, or whether DSS instead can only recoup that portion of the settlement proceeds allocated to past medical expenses; (2) if *683 the DSS recoupment is limited to the allocated amount, how should the court proceed to determine that amount because the settlement itself does not include an express allocation for past medical expenses; and (3) whether the Medicaid lien must be satisfied before any settlement proceeds are released to the plaintiffs. The parties’ positions on these issues are diametrically opposed.
Plaintiffs assert that: (1) the DSS recoupment is limited to the amount of plaintiffs’ settlement allocated to past medical expenses; (2) the court is empowered to determine that amount by comparing the agreed upon settlement amount to the actual value of the case; and (3) plaintiffs’ counsel may hold in escrow an amount sufficient to cover the lien pending the court’s determination, but the balance of the settlement proceeds should be promptly disbursed to the plaintiffs.
DSS asserts that: (1) it is entitled to have its lien satisfied in full; (2) no allocation need be determined by the court because it is “inconceivable” that the $3,500,000 settlement does not include past medical expenses equal to the full $47,349.58 lien amount; and (3) the lien must be satisfied before any settlement proceeds are disbursed to the plaintiffs to ensure DSS a complete recovery.[1]
A review of the relevant statutory and decisional law, including the impact of Ahlborn on New York law, is necessary for the determination of these issues.
A. The Impact of Federal Medicaid Provisions on New York Law
Medicaid is a jointly funded federal and state medical assistance program established by title XIX of the Social Security Act (42 USC § 1396 et seq.). The Medicaid program allows state agencies such as DSS to receive federal funding so long as they comply with federal law. Thus, as acknowledged by the parties and as applicable here, because Medicaid payments were made on behalf of plaintiff Nyisha Lugo for medical expenses related to the injuries at issue in this case, DSS has the right to seek reimbursement for those payments from the tortfeasor liable for the injuries, which is defendant Beth Israel Medical Center. (42 USC § 1396a [a] [25] [H].) Indeed, under section 1396k (a) *684 (1), as a condition of her Medicaid eligibility, Lugo was required to assign to DSS her right to recover medical expenses from Beth Israel. This assignment reflects Congress’s intent that Medicaid be the ‘payer of last resort’ ” and that, when possible, liable parties should reimburse the State for medical expenses so as to minimize government costs. (Ahlborn, 547 US at —, 126 S Ct at 1767, quoting S Rep No. 99-146, 99th Cong, 1st Sess, at 313 [1985].)
The two leading cases which governed New York law before Ahlborn are Gold v United Health Servs. Hosps. (95 NY2d 683 [2001]) and Cricchio v Pennisi (90 NY2d 296 [1997]). Both cases address aspects of the issue presented in the case at bar, namely, the right of DSS to recoup Medicaid expenditures from a recipient’s personal injury settlement. After reviewing applicable federal and state statutes, the Court of Appeals in Gold rendered a determination on which DSS here relies to answer the first two questions in this case noted above, holding (at 691) that: “The [social service] agencies have broad authority under those provisions to satisfy the lien from the entire amount of the personal injury judgment or settlement.” Thus, DSS here argues that: (1) it can recoup the full lien amount from the entire settlement proceeds; and (2) no express allocation is required.
Similarly, the Court of Appeals in Cricchio rendered a determination on which DSS here relies to answer the third question in this case noted above, holding (at 302-303) that: “Applying both Federal and State Medicaid statutes, we conclude that the Department of Social Services (DSS) is entitled to first satisfy the lien from those [personal injury settlement] funds, leaving the remainder available for transfer to a supplemental needs trust [for the benefit of the Medicaid recipient plaintiff].” Thus, DSS here argues that no monies may be disbursed to the plaintiff until the DSS lien has been satisfied in full.
B. The Right of DSS to Recoup Medicaid Expenditures
As noted above, the parties have raised three issues relating to the right of DSS to recoup Medicaid expenditures from a recipient’s personal injury settlement. Those issues are determined as follows.
1. The DSS Recoupment is Limited to Proceeds Allocated to Medical Expenses
Contrary to the claim by DSS in the May 15, 2006 affirmation submitted to this court, Ahlborn has had a significant impact on New York law, and DSS cannot automatically recoup the *685 $47,349.58 lien from Lugo’s entire settlement proceeds. In fact, as plaintiff properly asserts, the Ahlborn court directly addressed that issue, and the decision applies here to bar DSS from recouping its lien from any settlement monies not allocated to past medical expenses.
Ahlborn relied in large part on the “antilien” provision found in 42 USC § 1396p (a). That provision bars the State from imposing any lien against the property of a recipient such as Ms. Lugo here on account of medical assistance paid prior to the recipient’s death. The Ahlborn court concluded that the Arkansas statute at issue, which provided for a “statutory lien on any settlement, judgment, or award received [by a Medicaid recipient] from a third party” (Ahlborn, 547 US at —, 126 S Ct at 1759), violated the federal antilien provision by allowing a lien on the recipient’s personal property:
“There is no question that the State can require an assignment of the right, or chose in action, to receive payments for medical care. So much is expressly provided for by §§ 1396a (a) (25) and 1396k (a). And we assume, as do the parties, that the State can also demand as a condition of Medicaid eligibility that the recipient ‘assign’ in advance any payments that may constitute reimbursement for medical costs. To the extent that the forced assignment is expressly authorized by the terms of §§ 1396a (a) (25) and 1396k (a), it is an exception to the antilien provision. . . . But that does not mean that the State can force an assignment of, or place a lien on, any other portion of Ahlborn’s property. As explained above, the exception carved out by §§ 1396a (a) (25) and 1396k (a) is limited to payments for medical care. Beyond that, the anti-lien provision applies.” (Ahlborn, 547 US at —, 126 S Ct at 1763 [emphasis added].)
Wholly unavailing is the attempt by DSS in this case to distinguish Ahlborn and the Arkansas statute at issue there from the case at bar. In the May 15, 2006 affirmation, DSS argues that the New York statute, as construed by the Cricchio court, does not violate the antilien provision because the statutory lien attaches to the property of the third-party tortfeasor, and not to the property of the Medicaid recipient as was the case with the Arkansas statute. Although the two statutes are worded differently, no basis exists for the asserted distinction. As plaintiff correctly notes in the May 16 reply, the discussion *686 by the Ahlborn court is extensive, and it construes various federal statutes to broadly define the scope of the recipient’s personal property protected by the antilien provision. Without limiting itself to the language in the Arkansas statute, the court directly confirms that the Medicaid “lien attaches to the property of the recipient.” (547 US at — n 14, 126 S Ct at 1763 n 14.)
The Ahlborn court also relies on 42 USC § 1396a (a) (25) (H) to limit the DSS recoupment to the amount allocated to medical expenses. Expressly rejecting the argument by the Arkansas social services agency that it could recoup the lien from the recipient’s entire settlement proceeds, the court stated as follows:
“But that reading ignores the rest of the provision, which makes clear that the State must be assigned ‘the rights of [the recipient] to payment by any other party for such health care items or services.’ . . . (emphasis added). Again, the statute does not sanction an assignment of rights to payment for anything other than medical expenses — not lost wages, not pain and suffering, not an inheritance.” (547 US at —, 126 S Ct at 1761.)
Thus, Ahlborn must be read to limit the DSS recoupment to the amount of the settlement proceeds allocated to past medical expenses. To the extent the Cricchio or Gold decisions suggest otherwise, Ahlborn implicitly overrules them.
2. This Court is Empowered to Allocate the Settlement Proceeds
Notwithstanding the above argument, DSS does acknowledge here that “Ahlborn stands for the proposition that a Medicaid lien may be placed on that portion of the settlement proceeds that represents payments for medical care.” (May 15 affidavit at ¶ 8.) It nevertheless insists that “it is not necessary to order an ‘allocation’ among the claimed damages since it is inconceivable that the $3,500,000 settlement would not include damages representing the full amount of past medical expenses ($47,349.58 through February 1, 2006) for the injuries suffered by the infant plaintiff.” (Affidavit at 1Í 8.) Should the court direct an allocation hearing over the objection of DSS, the agency contends that it needs discovery to avoid the risk of “manipulation” by plaintiff in her characterization of the dam *687 ages and a resulting underpayment to DSS. (DSS letter of June 16, 2006.)[2]
Plaintiff asserts in its June 16 response that DSS is bound by the position it asserted in a federal action pending before Judge Koeltl in the Southern District on this issue, entitled Sanchez v City of New York (05 CV 5466). There, DSS expressly agreed that any recoupment was limited to the amount of the settlement allocated to past medical expenses.
More significantly, however, plaintiff asserts in its June 23 submission that Ahlborn created a formula which would allow this court to expeditiously determine the allocation. According to that formula, the court should determine the ratio between the settlement amount and the actual value of the case, and then apply that same ratio to medical expenses. So, for example, if a case valued at $300,000 settles for $100,000, the ratio of settlement to value is one third. Assuming the full value of the Medicaid expenses was $27,000, the court can determine that the portion of the settlement allocated to past medical expenses was one third of $27,000, which is $9,000. In Ahlborn, the parties stipulated that
“the [$550,000] settlement amounted to approximately one-sixth of the reasonable value of Ahlborn’s claim [estimated at $3,040,708.12] and that if her construction of federal law was correct, [the Arkansas social services agency] ADHS would be entitled to only the portion of the settlement ($35,581.47) [or about one-sixth of the $215,645.30 lien] that constituted reimbursement for medical payments made.” (547 US at —, 126 S Ct at 1754.)
DSS vigorously disagrees that Ahlborn created a formula applicable here, arguing that the formula applied in that case was by stipulation between the parties limited to that case. (DSS June 29 letter.) The answer to the question lies somewhere between the positions of the two parties here. It is beyond dispute that the formula utilized in Ahlborn was based on a specific stipulation entered into by the parties, but that fact does not necessarily mean that such a formula should not be utilized here. Such a formula is rational. What is more, nowhere in its *688 discussion of the stipulation does the Ahlborn court suggest that the formula is in any way improper. Instead, the Court appears to sanction the formula by equating the stipulation to a judicial determination allocating the award, stating that the “effect of the stipulation is the same as if a trial judge had found that Ahlborn’s [ability to recover on the award of] damages” was limited in proportion to the percent of comparative negligence determined by the court. (547 US at — n 9, 126 S Ct at 1761 n 9; see also 547 US at — n 11, 126 S Ct 1762 n 11 [equating the stipulation with a “judge-allocated settlement or even a jury award”].)
Citing with approval the amicus brief for the Association of Trial Lawyers of America (at 20-21 [reprinted at 2006 WL 139217]), the Ahlborn court recognized that, where a stipulation is not forthcoming, it is appropriate for the trial court to hold an allocation hearing. As indicated in the cited section of the brief, such a hearing avoids the risk of “manipulation” feared by DSS in this case. (See id. at 7; June 16 letter.) Further, such a postsettlement allocation hearing would not be unusual. As the United States noted in Ahlborn, trial courts “conduct post-settlement hearings to allocate settlements between taxable and non-taxable income categories.” (Brief for United States at 17 n 7 [citing cases] [reprinted at 2006 WL 3226397].) Also, as the Trial Lawyers added in their brief (at 20-21):
“Similarly, a number of states already have well-developed procedures in place for allocating the proceeds from a tort settlement. In Minnesota, for example, trial courts can convene a so-called ‘Henning hearing’ to allocate settlement proceeds between categories of damages recoverable by a subrogated insurer and non-recoverable damages. See Henning v Wineman, 306 NW2d 550 (Minn. 1981). To the same end, the Wisconsin Supreme Court has upheld a trial court’s use of a ‘Rimes hearing,’ a post-settlement ‘mini-trial’ to allocate proceeds. See Rimes v State Farm Mutual Automobile Ins. Co., 316 NW2d 348 (Wisc. 1982).”
However, to the extent that plaintiff Lugo suggests that the Ahlborn decision mandates the use of the same formula here and obviates the need for a hearing, this court does not necessarily agree. A court determination is necessary to confirm the full value of the case and the value of the various items of damages, including plaintiff’s injuries and how they compare to *689 verdicts awarded in other cases. The parties are also entitled to be heard on the fair allocation of the settlement proceeds.
Plaintiffs’ counsel in his June 22 affirmation to this court has valued the case at $7 to $7.5 million. In support of that assertion, he has offered five exhibits for consideration by the court: the January 11, 2006 report on Nyisha Lugo by Leon Charash, M.D.; the January 27, 2006 report and life care plan for Nyisha Lugo by Dr. Carfi; the January 5, 2006 New York City Department of Education individualized education plan for Nyisha; the April 24, 2002 core evaluation of Nyisha; and the transcript of the March 4, 2005 examination before trial of Cindy Lugo. These documents establish that Nyisha, who is about 44/2 years old, suffers from cerebral palsy, strabismus and cognitive impairments resulting from mild retardation. She uses a wheelchair, cannot stand or sit without support, cannot crawl very well, and is participating in occupational and physical therapy four times a week to learn to walk with the use of leg appliances. Nyisha’s speech is immature and difficult to understand, and she receives speech therapy. She cannot copy letters or numbers and cannot recognize numbers, though she can count to 10. Nyisha will require constant supervision and assistance for the rest of her life, and it is unlikely she will ever be employed.
As evidence of the value of the case, plaintiffs’ counsel has cited three appellate court decisions involving jury awards for infants with similar injuries. In Nevarez v New York City Health & Hosps. Corp. (248 AD2d 307 [1st Dept 1998]), the First Department reduced a jury award from $10,209,724 to $6,255,772 for an infant suffering from cerebral palsy due to hypoxia. In Karney v Arnot-Ogden Mem. Hosp. (251 AD2d 780 [3d Dept 1998]), the appellate court reduced a jury verdict of over $13 million to $6,929,000 for an infant suffering from cerebral palsy. In Andree v Winthrop Univ. Hosp. (277 AD2d 265 [2d Dept 2000]), the appellate court affirmed the trial court’s decision reducing a jury verdict of $15 million to a sum totaling $6,215,129.48 based on injuries similar to those suffered by Nyisha Lugo in this case. Based on these cases, plaintiffs assert that the Lugo settlement for $3.5 million is about 50% of the $7 million “true value,” and they therefore urge that the Medicaid lien be similarly reduced by 50%.
DSS is entitled to an opportunity to challenge the data proffered by plaintiffs as to the “true value” of the case vis-a-vis similar cases and the predicate data on which that value is calculated. The court is therefore directing the parties to appear *690 for a conference to discuss which issues have been agreed upon, which issues remain to be tried, and what discovery, if any, is needed to determine the allocation of damages.
3. The Lien Monies May Properly be Held in Escrow
As to the third question noted above, DSS here relies on Cricchio to argue that plaintiff may not receive any settlement proceeds until the Medicaid lien has been satisfied in full. However, that argument must fail because, as noted above, Ahlborn implicitly overruled Cricchio. What is more, a virtually identical argument was made by the social services agency in Ahlborn and rejected. (547 US at —, 126 S Ct at 1761-1763.) Since the recipient is obligated to assign only damages representing payments for medical care, and since federal law prohibits a lien on any part of the recipient’s property other than the monies allocated to medical expenses, no authority exists to hold back the plaintiffs’ money. Indeed, it appears that holding back the plaintiffs’ settlement proceeds might well violate federal law. What is more, the prompt release of the settlement proceeds to the plaintiffs will benefit DSS, as plaintiff Nyisha Lugo will be using a portion of those proceeds to obtain private medical insurance and end her reliance on Medicaid. Thus, in accordance with the terms of the order signed in this case, plaintiffs’ counsel shall arrange to hold in escrow the sum of $47,349.58, which the parties agree was the amount of the Medicaid lien the month when this action was settled.

. As to the third issue, DSS originally asserted a $47,349.58 lien for the period from June 6, 2002, when Medicaid benefits began, through February 1, 2006, the month the settlement was reached. However, in its June 16, 2006 letter to the court, DSS suggested an entitlement to an unspecified additional amount for the period from February 1, 2006 and continuing until the infant plaintiff obtains private medical insurance.

. DSS also asserts that no hearing can be held without a motion on notice to DSS. This court disagrees. DSS cannot seriously dispute that it has been afforded an ample opportunity to be heard, both on papers and orally. Further motion practice would lead to unnecessary delay, which DSS itself claims — in the very same letter — would be prejudicial.